**GENERAL INSTRUMENT CORPORATION OF DELAWARE, Plaintiff,**

v.

**NU–TEK ELECTRONICS & MANUFACTURING, INC., Defendant.**

**Civil Action No. 93–3854.**

United States District Court, E.D. Pennsylvania.

April 7, 1998.

---

Stephen W. Armstrong, Douglas L. Overtoom, Peter Breslauer, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Nu–Tek Electronics & Mfg., Inc.

Geoffrey L. Beauchamp, Wisler, Pearlstine, Talone, Craig, Garrity & Potash, Blue Bell, PA, for Philip S. Deming.

Burrell D. Johnston, Austin, TX, for Bears and Bows, Inc. and Brenda Abboud.

Geoffrey L. Beauchamp, Mason Avrigian, Michael D. Kristofco, Wisler, Pearlstine, Talone, Craig, Garrity & Potash, Blue Bell, PA, for General Instrument Corporation of Delaware.

## MEMORANDUM

GAWTHROP, District Judge.

A jury found defendant Nu–Tek Electronics & Manufacturing, Inc. ("Nu–Tek") liable to plaintiff General Instrument Corporation of Delaware ("GI")[1] for willful violation of the Cable Communications Policy Act of 1984 ("Cable Act"), 47 U.S.C. § 553, with respect to 5,376 cable descrambling devices Nu–Tek had sold. Before the court are sundry post-trial motions, including Nu–Tek's motions (1) for reconsideration of the order granting relief from stipulated confidentiality orders, (2) to amend the final injunction order, (3) and for judgment as a matter of law on the Cable Act claim. In addition, Nu–Tek has petitioned for attorneys' fees related to GI's unsuccessful copyright and Lanham Act claims. Also before the court are GI's motions for attorneys' fees related to the Cable Act claim, and for sanctions. Upon the following reasoning, I shall deny Nu–Tek's motions and its petition for attorneys' fees. I also shall grant GI's motion for attorneys' fees, but deny its motion for sanctions.

## I. Background

Cable operators ordinarily deliver programming signals to subscribing households in scrambled form, both basic service and premium channels. Scrambled signals must then be deciphered by a device known as a decoder or descrambler, which cable operators provide to subscribers for a monthly charge. A subscriber paying for basic service, however, can gain unauthorized access to premium channels by purchasing a "pirate" descrambler from a source other than the cable operator.

GI, a cable box manufacturer, brought suit against Nu–Tek alleging that Nu–Tek, without authorization, sold devices designed to descramble cable signals. The complaint alleged violations of the Cable Act, the Lanham Act, and copyright laws. GI manufacturers and sells cable-signal descrambler units to cable operators around the country. These units contain computer chips or integrated circuits which descramble the cable signals. GI claimed that Nu–Tek's business consisted of modifying GI-manufactured cable boxes and selling them to subscribers, who could then access premium channels without knowledge or authorization from the cable operator. Although GI does not sell any of its boxes directly to Nu–Tek, Nu–Tek nevertheless obtained original GI descrambler boxes and converted them for this unlawful purpose. From about 1992 to 1995, Nu–Tek sold over 5,000 such cable theft devices.

Before the trial, the parties voluntarily agreed to a dismissal of GI's copyright claims. (Stipulation of Dismissal of Count XI, 11/9/95.) This court also dismissed GI's claim brought under 47 U.S.C. § 605. *See General Instrument Corp. of Delaware v. Nu–Tek Elec. & Mfg., Inc.,* No. 93–CV–3854, 1996 WL 402511 (E.D.Pa. April 12, 1996). The remaining claims went to trial, and the jury returned a verdict for GI on the Cable Act § 553 claim, and for Nu–Tek on the Lanham Act claims.

## II. Discussion

**A. Nu–Tek's motion to reconsider, vacate, or modify the order granting plaintiff's motion for relief from the stipulated confidentiality orders**

The parties had entered two Stipulated Confidentiality Orders, on January 20 and August 29, 1995. The January 20 order prohibited the disclosure of documents obtained in this litigation to third parties, except for those certain individuals involved in this case, and the August 29 order similarly prohibited the disclosure of Nu–Tek's tax returns.

1. In or about July 1997, NextLevel Systems, Inc. became the successor-in-interest to General Instrument Corporation of Delaware.

Following the trial, GI moved for relief from the confidentiality orders, which I granted on May 23, 1997. (Order, 5/23/97.) There, I applied the balancing test set out in *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir.1994). In addition to Nu–Tek's liability for its willful violation of the Cable Act, I noted that "David J. Abboud, a Nu–Tek principal, testified very unconvincingly that he did not know that the federal government had charged his father and brother, two men involved in similar business ventures, with violations of § 553(b)." (Order, 5/23/97 at 2.) I concluded that "the public interest strongly favors modification of the order to permit GI to provide documents to law enforcement officers." (*Id.*) Overall, the importance of the public interest in obtaining knowledge of the cable theft operations outweighed the harm to Nu–Tek that their business practices would be disclosed to third parties.

■ A federal district court will grant a motion for reconsideration based upon one of three reasons: "(1) an intervening change in controlling law, (2) the emergence of new evidence not previously available, or (3) the need to correct a clear error of law or to prevent a manifest injustice." *Environ Products, Inc. v. Total Containment, Inc.*, 951 F.Supp. 57, 62 n. 1 (E.D.Pa.1996); *see also Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986) ("The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence.").

Nu–Tek bases its motion on the third reason stated above, a clear error of law. In particular, it seeks reconsideration of the provision allowing GI to disclose Nu–Tek's tax returns. It argues that distributing its tax returns to third parties serves no legitimate interest, and therefore, does not satisfy the requirement in *Pansy* that "[t]he party seeking to modify the order of confidentiality must come forward with a reason to modify the order." 23 F.3d at 790. It also asserts that during oral argument GI conceded that the tax return provision allowing for disclosure could be removed from the final order. GI's counsel stated "[t]hat subparagraph,

Your Honor, we could eliminate subparagraph 3 [i.e., the tax return paragraph]." (Tr. Oral Argument, 4/7/97 at 59–60.)

GI responds that the motion is moot since it has already disclosed and used information from Nu–Tek's tax return—although it does not say to whom. GI's counsel also maintains that at oral argument he did not withdraw his request for relief, but rather, he characterizes the above-quoted remarks as simply addressing the court's concerns. Lastly, GI states that Nu–Tek has filed for bankruptcy, providing an additional need for the tax returns.

I find that Nu–Tek has failed to present a sufficient reason to vacate or modify the tax return provision of the May 23 Order. The harm that Nu–Tek now complains of is no different than the harm that existed when the order was first entered. In that order, I found that the public interest is served by whatever information of criminal activity may be disclosed to law enforcement officers in this case. I made this finding with full knowledge of the comments at oral argument, which are not necessarily indicative of a final ruling. After careful consideration of the arguments and competing interests, there was a balanced determination made as to whether the tax returns should remain confidential. I concluded that they should not, and I see no reason here to disturb that decision. Accordingly, I shall deny the motion for reconsideration.

### B. Nu–Tek's motion to amend the final injunctive order

■ Nu–Tek, pursuant to Federal Rule of Civil Procedure 59(e), seeks to amend the June 11, 1997 Order, which permanently enjoins it from manufacturing or distributing GI descrambler boxes, modified to descramble cable signals without authorization. The injunction also prevents Nu–Tek from transforming into a new entity to continue its cable-theft business, or to contribute to other cable theft businesses.

Nu–Tek objects to the injunction on several grounds. It first argues that the injunction imposes permanent restrictions going beyond the scope of reasonable relief that the

court may grant in a final injunction. *See* 47 U.S.C. § 553(c). Specifically, it asks that the court remove the terms "employees" and "related companies" in paragraph 2 of the order, arguing that these groups are not before the court and are beyond its control.[2] Although Nu–Tek concedes that the court may restrict the activities of its employees occurring within the scope of employment, it suggests the court cannot include "employees" because there is no individual jurisdiction over the employees. This argument, however, ignores the plain language of Rule 65(d), which permits a court to grant an injunctive order binding "employees," regardless of individual jurisdiction over the employees. *See* Fed. R.Civ.P. 65(d).

■ As to "related companies," Nu–Tek asserts that the term is unclear which companies fall within this term, thus making it vague and·overbroad. "Related companies," however, is more definite and clear than Nu–Tek contends. Specifically, there was testimony concerning two other companies, Outlander and Digitech, operated by Nu–Tek principal David Abboud. They acted in concert with Nu–Tek: Outlander managed Nu–Tek's sales operations, and Digitech produced circuit boards used by Nu–Tek for manufacturing its cable theft devices. (*See generally* Tr. Oral Argument, 4/7/97 at 50–51.) To the extent that Outlander and Digitech, or any other company, assisted Nu–Tek in its violative business, they are "related

companies." I thus find that the language in paragraph 2 is sufficiently clear and requires no amendment.

■ Nu–Tek also challenges the use of the phrase, "either alone or in conjunction with any other item," in subparagraph 2.a of the order, as vague·and overbroad.[3] It argues that the phrase reasonably could be interpreted as prohibiting it from selling legitimate equipment, since any equipment sold by Nu–Tek could potentially be modified by someone else without Nu–Tek's knowledge or participation. This subparagraph, however, is intended to discontinue Nu–Tek's cable theft enterprise, and the challenged phrase merely prevents Nu–Tek from evading its mandate by prohibiting Nu–Tek from manufacturing a component part of a cable theft device. The court has already made clear that possession of genuine unmodified GI devices does not necessarily violate the injunction. (Tr. Oral Argument, 4/7/97 at 65–66.)

■ Nu–Tek next proposes that the court eliminate subparagraphs 2.b and 2.c. It argues that 2.b prevents it from selling any products at all,[4] and that 2.c[5] unduly restricts the transfer of Nu–Tek assets. I disagree. The underlying fact is that Nu–Tek's business essentially facilitated cable theft in violation of § 553. To stop such an operation is a primary purpose of the injunction. It forecloses none of Nu–Tek's remain-

---

2. Paragraph 2 reads, in relevant part:

   Nu–Tek *and all of its directors, officers, agents,* shareholders, *employees, related companies,* successors, *assigns, and all persons now or* hereafter under their control or in active concert or participation with them, are hereby permanently enjoined from . . .
   (Order, 6/11/97 at 1) (emphasis added).

3. Subparagraph 2.a enjoins Nu–Tek from:

   Designing, manufacturing, assembling, modifying, advertising, selling, marketing, or distributing an products, devices, equipment, or electronic components thereof, originally manufactured by the plaintiff, . . . [GI], or other products, devices, equipment, or electronic components thereof, that are designed, intended, or capable of being used, *either alone or conjunction with any other item,* to receive and descramble, or to. assist any person to receive and descramble, encrypted or scrambled cable television programming without the knowl-

edge or authorization cable operators in whose systems GI equipment is used;
   (Order, 6/11/97 at 2) (emphasis added).

4. Subparagraph 2.b enjoins Nu–Tek from:

   Removing, secreting, concealing, or destroying any records, property, or equipment relating to the [sic] Nu–Tek's business operations, including, without limitation, its customer lists, supplier lists, invoices, sales orders, inventory, equipment, and property;
   (Order, 6/11/97 at 2.)

5. Subparagraph 2.c enjoins Nu–Tek from:

   Transferring, removing, encumbering, or permitting the withdrawal of any assets or property presently belonging to Nu–Tek, whether real or personal, tangible or intangible, including, but not limited to, cash, bank accounts of any kind, stock accounts, bonds, and title to Nu–Tek's business property.
   (Order, 6/11/97 at 2.)

ing legitimate business because, from the start, no identifiable legitimate business existed. Likewise, I find that Nu–Tek should not be allowed to use its remaining assets, which in all likelihood can serve only to further other cable theft enterprises. I thus shall leave subparagraph 2.b and 2.c unaltered.

■ Finally, Nu–Tek argues that its bankruptcy filing has mooted all provisions of the injunction, except 2.a. If, however, the other provisions are moot, then removing them is of no benefit to Nu–Tek. Nevertheless, this court will not endeavor to predict the fate of the bankruptcy proceeding. Should Nu–Tek choose to withdraw its bankruptcy application, the injunction, still in place, safeguards GI's interests and prevents further violations of 47 U.S.C. § 553. Accordingly, the motion to amend the injunctive order is denied.

### C. Nu–Tek's motion for judgment as a matter of law

*Under Rule 50(b), a court should grant judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference," insufficient evidence exists "from which a jury reasonably could find liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.1993). "In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." Id.*

■ Nu–Tek seeks to vacate the jury verdict that it is liable to GI for violation of 47 U.S.C. § 553, arguing that GI failed to present sufficient evidence to prove a violation of that statute. Nu–Tek first contends that GI failed to prove injury as a "person aggrieved" in violation of 47 U.S.C. § 553(a). It characterizes the claimed injury as "a pecuniary loss caused by [its] sale of non-addressable cable boxes." (Def.'s Mem. J. as a Matter of Law at 2.) It states that GI presented no evidence of economic loss, and that the only potential evidence of loss was testimony about a Sacramento, California cable operator which, in 1990, switched to GI's competi-

tor. As to testimony that cable operators are inclined to switch their business because of security threats, Nu–Tek labels such testimony as speculative and hypothetical, not evidence of injury-in-fact.

This argument, however, is flawed in several respects. First, the claimed injury is more encompassing than that described by Nu–Tek. GI's injuries, among other things, included: (1) actual and prospective interference with GI's customer and business relations, (2) damages to GI's goodwill and business reputation, (3) out-of-pocket security and cable-piracy-related expenses, and (4) actual and potential adverse impact on demand for GI's products.

Second, as I observed in a prior opinion: "[t]here was credible testimony to the effect that the thievery of programs using GI's altered devices caused them to suffer injury on the economic market, running the risk that cable companies would switch to using another box, less susceptible to electronic chicanery." *General Instrument Corp. of Delaware v. Nu–Tek Elec. & Mfg., Inc.,* No. 93–CV–3854, 1997 WL 325804, at *3 (E.D.Pa. June 4, 1997). Despite Nu–Tek's claims otherwise, the record is replete with testimony evidencing injury, particularly as found in the statements of Stan Durey, Robert Lauer, and Geoffrey Rochester. For instance, Mr. Durey, GI's Director of Security, explained that GI's customers, the cable operators, hold GI accountable when theft devices such as Nu–Tek's are found in their system. (Trial Tr., Day Two at 108; *see also id.* at 109–110, 150–58, and 165–67.) He stated that "[i]n fact, it has in some instances actually cost us customer accounts. We have actually lost sales because our inability to resolve infestations of these kind of devices in customers' systems." (*Id.* at 110.) This is confirmed by the testimonies of the cable operators. For example, Mr. Lauer, Manager of Safety and Security for Suburban Cable TV, testified that security problems in their GI supplied system threaten the viability of their business relationship with GI. (Trial Tr., Day Three at 232–33.) Mr. Rochester, the Senior Vice President for Sales and Marketing for Comcast Cable, described the threat as follows: "[T]here are three or four people vying

for Comcast's business. GI is one of them. If GI fails to do their job correctly, which is supporting [sic] theft, not allowing theft in our system, if GI doesn't do a good job we will go to somebody else, like Scientific Atlanta." (Trial Tr., Day Two at 239.)

Lastly, to combat this real threat to its business, GI incurs significant security-related expenses. Indeed, Mr. Durey stated that his job is devoted full-time to combating theft devices and assisting GI's customers in their own security efforts. (Trial Tr., Day Two at 107–08.) Such interferences with business have been recognized as causing injury. *See S & R Corp. v. Jiffy Lube Int'l*, 968 F.2d 371, 378 (3d Cir.1992) (irreparable injury sufficient to support preliminary injunction found in loss of trade and loss of goodwill). Nu-Tek unabashedly attempts to turn this scenario on its head, arguing that GI has Nu-Tek to thank for the existence of its security business, because without theft there would be no need for security measures. This argument is meritless. I thus find that the evidence adduced at trial provided an ample basis for a reasonable jury to conclude that injury occurred.

▆▆▆▆ Nu–Tek also argues that GI failed to present evidence that the cable subscribers using Nu–Tek boxes were unauthorized to receive cable services, and that, to prevail, GI must prove such unauthorized reception. But the issue is not whether service was illegally received.[6] Proof that a cable subscriber used a non-addressable cable device without authorization is unnecessary to establish a violation of § 553(a). *U.S. v. Gardner*, 860 F.2d 1391, 1397–98 (7th Cir.1988). As to manufacturers and distributors of cable boxes, the plaintiff must only show facts sufficient to prove an intent to assist customers in unauthorized reception. *See Continental Cablevision Inc. v. Poll*, 124 F.3d 1044 (9th Cir.1997); *U.S. v. Beale*, 681 F.Supp. 74 (D.Me.1988) (proof of actual interception or reception of cable service in not required if there is proof of willful manufacture or distribution of equipment intended for unauthorized use). Proof of such intent to assist can be shown by the sale of non-addressable or "bulletproof" descramblers.[7] *See Subscription Television of Greater Washington v. Kaufmann*, 606 F.Supp. 1540, 1543 (D.D.C. 1985) (only function of removing addressability function is to enable unauthorized reception); *TKR Cable Co. v. Cable City Corp.*, 1996 WL 465508, *7 (D.N.J.1996) ("bullet protectors offered by defendants which defeat security measures of the cable companies clearly show the defendants' intent to assist in the theft of cable television services"). Testimony that Nu–Tek was selling chameleons, a non-addressable device whose sole function is to descramble cable signals, and so-called "bulletproof" descramblers was sufficient ground for a reasonable jury to find an intent to assist in unauthorized reception, a violation of § 553. (*See, e.g.,* Trial Tr., Day One testimony of Mr. Deming.)

In attempting to prove its point, Nu–Tek urges the court that finding liability without actual unauthorized reception would 'read out' the phrase "unless authorized to do so by a cable operator." This would lead to the absurd result, Nu–Tek contends, of making it illegal simply to receive cable services. However, Nu–Tek pursues a selective reading of the statute, in that it would apply the "unless authorized" phrase only to the acts of intercepting or receiving service. Reading the statute exactly as written, however, one finds that "no person shall intercept or receive *or assist in intercepting or receiving any communications offered over a cable*

---

6. Counsel for Nu–Tek conveniently omit words when quoting from *Continental Cablevision, Inc. v. Poll*, 124 F.3d 1044 (9th Cir.1997), so as to contort that case to support their arguments. While Nu–Tek quotes *Continental Cablevision* as saying that § 553 requires a " 'a showing' of 'unauthorized interception or reception,' " the full sentence quoted actually states that § 553 "requires a showing, *that defendants have the intent to assist in the* unauthorized interception or reception." *Continental Cablevision*, 124 F.3d at 1047 (emphasis added).

7. A "bulletproof" or non-addressable descrambler is a signal descrambler which cannot be programmed or modified by the cable company (using electronic "bullets" sent over the cable system) to control the channels which are accessible. If such a device is attached in a customer's home, they can access cable services without the cable company's knowledge or consent. Cable companies usually distribute addressable descramblers to their paying customers.

*service, unless authorized to do so."* The plain language is that one must have authorization both to receive service and to assist another in receiving service. During trial, Nu–Tek presented no evidence that it had authorization by a cable operator to "assist in intercepting." GI presented evidence both that Nu–Tek's customers alleged that they were customers of Comcast and Suburban Cable and that neither of these two companies authorized Nu–Tek to assist their customers in intercepting or receiving cable services.

Giving this evidence "every fair and reasonable inference," as required under Rule 50(b), I find it is certainly sufficient to support a verdict that Nu–Tek intended to assist in unauthorized interception of cable services and was not authorized to assist these customers in receiving cable service. Accordingly, the motion for judgment as a matter of law is denied.

### D. Nu–Tek's petition for attorneys' fees

As the prevailing party on the copyright and trademark claims, Nu–Tek has petitioned this court for attorneys' fees, pursuant to the Copyright Act, 17 U.S.C. § 505, and for attorneys' fees and costs, pursuant to the Lanham Act, 15 U.S.C. § 1117(a). GI responds that the request for attorneys' fees on the copyright claims is obviously frivolous, and thus, the court should sanction Nu–Tek's counsel, pursuant to Federal Rule of Civil Procedure 11.

#### 1. Attorneys' fees related to the copyright claims and GI's motion for sanctions

■ In a stipulation, the parties voluntarily agreed to the dismissal of Count XI. It reads:

> Pursuant to Fed.R.Civ.P. 41(a)(1), it is hereby stipulated, by and between counsel for Plaintiff and counsel for Defendant, that Count XI of the Second Amended Complaint [the copyright claim] is dismissed with prejudice, with each party to bear its own costs relating to this claim.

(Stipulation of Dismissal of Count XI, 11/9/95.) Since the claim was dismissed with prejudice, Nu–Tek is the prevailing party.

It thus argues that it is entitled to attorneys' fees, pursuant to 17 U.S.C. § 505, which provides:

> In any civil action under this [Copyright] title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorneys' fee to the prevailing party as part of the costs.

GI opposes the awarding of attorneys' fees to Nu–Tek, pointing to the language in the Stipulation that "each party [is] to bear *its own costs* relating to this claim." (emphasis added). GI further argues that as 17 U.S.C. § 505 describes attorney's fees as "part of the costs," those "costs" in the stipulation clearly includes attorneys' fees. *See, e.g., Zuk v. EPPI of Medical College of Pennsylvania,* 103 F.3d 294, 297 (3d Cir.1996) ("Under this Act, a reasonable attorney's fees may be awarded in the court's discretion to the prevailing party against the other party as costs.").

Indeed, GI maintains that in this context the meaning of "costs" is so clear that Nu–Tek's counsel should be sanctioned under Rule 11 for bringing an obviously frivolous claim. Nu–Tek, on the other hand, asks that the court read the Stipulation in the context of the American rule, which generally does not include attorneys' fees within the term "costs."

The Stipulation fails to define "costs." As the petition for fees is based on the Copyright Act, 17 U.S.C. § 505, I shall look to it for guidance. It plainly states that "costs" includes attorney's fees. *Id. See Zuk,* 103 F.3d at 297. I thus shall apply this definition of "costs" to the Stipulation, and since it expressly states that "each party shall bear its own costs," Nu–Tek's petition for attorneys' fees related to the copyright claim is denied.

I find, however, that sanctions are unwarranted. Given that "costs" in the Stipulation is left undefined, Nu–Tek's suggestion that the common-law understanding of attorney's fees should apply has some, albeit limited,

merit. The motion for sanctions therefore is denied.

### 2. Attorneys' fees related to the Lanham Act claims

Nu–Tek also seeks attorneys' fees, pursuant to the Lanham Act, 15 U.S.C. § 1117(a), as the prevailing party on GI's claims (Count XII). 15 U.S.C. § 1117(a) provides: "The court in exceptional case may award reasonable attorneys' fees to the prevailing party." This Circuit requires that before a case qualifies as "exceptional," a district court must make a finding of culpable conduct on the part of the losing party, such as bad faith, fraud, malice, or knowing infringement. *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 47 (3d Cir.1991).

In this case, I denied summary judgment on the Lanham Act claims because there remained genuine issues of material fact. At trial, the jury found for Nu–Tek. Even though Nu–Tek ultimately prevailed on Count XII in a jury verdict, it does not support the inference that GI's claim was made in bad faith. Nor is there any other suggestion of malice or bad faith. I thus find that this case is not an exceptional one, and I shall deny Nu–Tek's request for attorneys' fees relating to its defense of the Lanham Act claims.

### E. GI's motion for attorneys' fees

The jury returned a verdict for GI on its claim under § 553 of the Cable Act, finding that Nu–Tek had sold cable-theft devices wilfully and for purposes of commercial advantage or private financial gain. On June 4, 1997, the court entered judgment in favor of GI for $60,000 in statutory damages, plus reasonable attorneys' fees. *General Instrument Corp. of Delaware v. Nu–Tek Elec. & Mfg., Inc.*, No. 93–CV–3854, 1997 WL 325804, at *3 (E.D.Pa. June 4, 1997). The last issue before the court is the amount of the fees to be awarded.

### 1. The lodestar method

The general starting point for fee awards is to multiply the number of hours reasonably expended on the litigation by a reasonable hourly rate, and add to that the reasonable expenses. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Washington v. Philadelphia Cty. Ct. of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir.1996). The result is called a "lodestar" and "is strongly presumed to yield a reasonable fee." *Id.* (citing *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)).

GI has submitted voluminous billing records and supporting affidavits, detailing the reasonable hourly rates, the attorneys, dates, the subject matter of the work, and the amount of time devoted to each matter. Three attorneys, along with paralegals, an investigator, and a jury consultant have been involved in this case for GI. Using the lodestar formula of multiplying the hourly rate by the number of hours, the attorneys' fees incurred in litigating this matter totaled $462,384.50. GI, however, reduced that number by $76,847.00, representing the amount of work done clearly unrelated to its prevailing claim. It also reduced the total by another $80,286.75, applying a negative multiplier, in recognition that some of the work done was only partially related to its prevailing claim. The final attorney fees, after reductions, is $305,250.75. GI next added $7,812.00 to this amount, as attorney fees for preparation of this motion. It then figured the costs for court reporters, Westlaw research, outside photocopying, mail service, and other miscellaneous items, which totaled $43,623.58. Finally, GI included investigative costs of $55,492.59. The sum total of all these calculations equals $412,178.92.

Nu–Tek objects to this figure on several grounds. It first argues that the lodestar approach itself is inappropriate, reasoning that a mechanical application is unwarranted because GI's $60,000 damages award represents a limited success, nominal in comparison to its initial claim for millions of dollars. Nu–Tek also notes that GI prevailed on only one of its claims, the § 553 claim, but lost the copyright claim, the 47 U.S.C. § 605 claim, and the Lanham Act claims. Nu–Tek cites *Farrar v. Hobby*, 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), for the proposition that the court is

obligated to give primary consideration to amount of damages awarded in comparison to the amount sought. When "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933. The United States Supreme Court in *Farrar*, a § 1983 civil rights case, held that plaintiffs who had won only a dollar from one of six defendants in a suit seeking seventeen million dollars were "prevailing parties" under § 1988, but that a fee award of $280,000.00 was unreasonable given their only nominal success. 506 U.S. at 115–16, 113 S.Ct. 566. The court noted that "the degree of success obtained" is the most critical factor in determining the reasonableness of the fee award. *Id.* at 114.

This case is easily distinguished from *Farrar*. Here, the $60,000 statutory damages award is more than nominal, especially since this represents the maximum award allowed under § 553. GI had asked for a far greater sum in damages, in part, because it believed that § 553 allowed $10,000 in damages for each unit sold. I ruled, however, that as a matter of law the maximum amount of damages that could be imposed was $10,000 in compensatory damages and $50,000 in punitive damages. *General Instrument*, 1997 WL 325804, at *3. Further, Nu–Tek fails to mention a critical aspect of GI's legal success, namely, the granting of final injunctive relief. The injunctive order prohibits Nu–Tek from continuing to harm GI's business. One of GI's primary goals in this litigation was to end the activities of Nu–Tek that threatened their business relationship with the cable operators. I thus find that GI's legal success is significant in that it was awarded the maximum statutory damages, and that it caused a permanent disruption to Nu–Tek's illegal activities.

Nu–Tek also argues that the lodestar method is unreasonable because it would result in a fee award greatly disproportionate to the amount of damages awarded. However, the Third Circuit rejected the notion that a fee award should be reduced based on its proportionality to the amount of damages.

*See Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1039–43 (3d Cir.1996). Accordingly, the lodestar method is a reasonable approach to determine attorneys' fees in this case.

### 2. Excessive and duplicative

Nu–Tek next argues that, even if the lodestar is used, the figure arrived at by GI should be reduced as excessive and duplicative. It argues that GI should not be rewarded for expending an excessively large amount of time on a straightforward matter. It contends that GI's counsel over-lawyered this case, particularly in light of their professed expertise in this area of the law. It thus seeks a reduction of 75%, instead of the 50% and 40% reductions used in GI's calculation.

GI responds that this area of the law is rapidly developing, that this case was the first jury trial to involve a § 553 claim, and that, through no fault of its own, there were numerous discovery disputes and motions, greatly increasing the time spent on this case.

After careful review, I find that the multiplier used by GI fairly reflects the amount of work devoted to the prevailing § 553 claim, and that a 75% reduction is too great. Accordingly, I shall award reasonable attorneys' fees in the amount of $412,178.92.