CSC HOLDINGS, INC., Plaintiff,

v.

NEW INFORMATION TECHNOLO-
GIES, INC. d/b/a Cable Mart, et
al., Defendants.

No. 3–00–CV–1398–BD.

United States District Court,
N.D. Texas,
Dallas Division.

June 27, 2001.

James W. Hryekewicz, Hughes & Luce, Dallas, TX, Daniel J. Lefkowitz, Wayne R. Louis, Law Office of Daniel J. Lefkowitz, Jericho, NY, for plaintiffs.

Anthony J. Siciliano, Law Office of Anthony J. Siciliano, Springfield, MA, for defendants.

### MEMORANDUM OPINION AND ORDER

KAPLAN, United States Magistrate Judge.

This cable piracy case was tried to the Court without a jury on May 15, 2001. The Court now makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### I.

Plaintiff CSC Holdings, Inc. d/b/a Cablevision is a national cable television service provider that owns and operates cable systems in New York, New Jersey, and Connecticut. Plaintiff offers its programming services in a variety of "packages" at a monthly rate. Broadcast Basic, the lowest and least expensive level of service, allows a subscriber to receive only network programming. Family Cable, an intermediate level of service, allows a subscriber to receive network programming plus MTV, CNN, TBS, VH–1, the Discovery Channel, and the History Channel. Plaintiff also offers certain "premium" programming services such as Cinemax, HBO,

Showtime, the Disney Channel, and The Movie Channel for an additional monthly fee per service. A subscriber who purchases Optimum Gold, the highest level of Cablevision premium service, receives all the premium channels plus Family and Broadcast Basic cable. Additional programs, such as sporting events and movies, are offered on a pay-per-view basis. Subscribers are entitled to receive only those programming services they elect to purchase.

Plaintiff "scrambles" its programming signals to prevent unauthorized access by non-subscribers. The signals must be deciphered by a descrambling device in order to view cable television programming. Plaintiff provides such a device, also known as a "decoder" or "converter," to its subscribers. The decoder is programmed to enable subscribers to receive only those cable channels purchased by them. However, a subscriber paying for basic service can gain unauthorized access to premium channels and pay-per-view events by purchasing a "pirate" decoder from a source other than the cable operator.

Defendants New Information Technologies, Inc. d/b/a Cable Mart, Jonathan Arakelian, Riaz Sajwani, and Raja Mustafeez manufacture and sell pirate decoder devices and related equipment for profit. By their own admission, defendants sold more than 100 such devices to customers in plaintiff's franchise area during 1999 and 2000. On July 5, 2000, plaintiff filed suit against defendants in federal court for violations of the Communications Act of 1934, as amended, 47 U.S.C. § 553(a).[1] This statute provides:

(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

(2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

47 U.S.C. § 553(a). Defendants have conceded liability and the case proceeded to trial on the issue of damages.

A bench trial was held on May 15, 2001. Plaintiff called two witnesses. Stan Durey, Director of Security Programs for General Instrument Corporation, a wholly owned subsidiary of Motorola, Inc., testified as an expert on cable piracy. Durey explained how cable operators secure their systems and how pirate decoder devices thwart that security. Joseph Flaim, a private investigator hired by plaintiff, testified as a lay witness on damages. Defendants presented no witnesses. At the conclusion of the testimony, the parties were given an opportunity to file post-trial briefs. The case is now ripe for final adjudication.

## II.

A person aggrieved by a violation of section 553(a)(1) may bring a civil action to recover actual damages or statutory damages. 47 U.S.C. § 553(c)(1). The relevant statute provides:

---

1. Plaintiff originally alleged violations of Sections 553 and 605 of the Communications Act and sought the imposition of a constructive trust under state law. However, it subsequently abandoned all claims against defendants except those arising under Section 553. (Plf.Sec.Am.Compl. ¶¶ 26–37).

Damages awarded by any court under this section shall be computed in accordance with either of the following clauses:

(i) the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages; in determining the violator's profits, the party aggrieved shall be required to prove only the violator's gross revenue, and the violator shall be required to prove his deductible expenses and the elements of profit attributable to factors other than the violation; or

(ii) the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just.

*Id.* § 553(c)(3)(A). In addition, the court may award enhanced damages not to exceed $50,000 if "the violation was committed willfully and for the purposes of commercial advantage or private financial gain." *Id.* § 553(c)(3)(B). Injunctive relief is also available to prevent or restrain violations of section 553(a)(1). *Id.* § 553(c)(2)(A).

Plaintiff seeks four types of relief in this case—actual damages, profits realized by the defendants, enhanced damages, and a permanent injunction. The Court will address each damage claim separately.

### A.

Plaintiff estimates that it sustained actual damages in the amount of $472,725.60 as a result of the sale of pirate decoder devices by defendants to customers in its franchise area. This damage figure consists of two elements: (1) damages resulting from unauthorized access to premium services; and (2) damages resulting from unauthorized access to pay-per-view programming.

### 1.

Joseph Flaim testified that 160 pirate decoding devices were sold by defendants to customers in plaintiff's service area during 1999 and 2000. (Tr. 78). In calculating damages, Flaim assumed that these customers had already subscribed to plaintiff's basic cable package at an average cost of $26.70 per month. Subscribers who purchased the pirate decoders had access to all available cable programming, which is equivalent to plaintiff's Optimum Gold package. The average cost for this level of service is $73.65 per month. The difference in cost between basic cable and Optimum Gold, or $46.95 per month, multiplied by the number of months each pirate decoder was in use, represents the actual damages suffered by plaintiff as a result of the violation of section 553(a)(1). (*Id.* at 70–71). Plaintiff estimates this sum to be $137,469.60.[2]

Defendants do not dispute the mathematical calculation of *gross* revenue lost by plaintiff as a result of the sale of pirate decoders. Instead, defendants maintain that this figure must be reduced by the expenses that plaintiff would have reasonably incurred had it actually provided the services in question to its subscribers. Plaintiff's own expert, Stan Durey, testified that cable operators typically pay 40

---

**2.** Flaim determined that 84 pirate decoder devices were sold by defendants in 1999 and 76 devices were sold in 2000. Almost all the decoders had been recovered by the time of trial. Therefore, Flaim assumed that the 84 devices purchased in 1999 were used for 24 months and the 76 devices purchased in 2000 were used for 12 months. The difference in cost between basic cable and Optimum Gold is $46.95 per month, which results in lost revenues of $94,651.20 for 1999 and $42,818.40 for 2000.

to 50 percent of their gross revenue to program providers as a licensing fee. Another five percent is paid in franchise taxes. (*Id.* at 36). Therefore, defendants argue that plaintiff's lost revenue must be reduced by these overhead expenses to arrive at actual damages.

 "Actual damages" is not defined in the statute. As a result, the Court must look to the plain meaning of the term. *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership,* 507 U.S. 380, 388, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993); *United States v. Gray,* 96 F.3d 769, 774 (5th Cir.1996), *cert. denied,* 520 U.S. 1129, 117 S.Ct. 1275, 137 L.Ed.2d 351 (1997). The term "actual damages" is synonymous with "compensatory damages," which is defined as:

> ... such [damages] as will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury.... The rationale behind compensatory damages is to restore the injured party to the position he or she was in prior to the injury.

BLACK'S LAW DICTIONARY at 390 (6th ed.1990).

In light of this definition, actual damages represent the *net* revenue lost by plaintiff as a result of the sale of pirate decoder devices. The evidence shows that plaintiff typically pays 45 to 55 percent of its gross revenue in licensing fees and franchise taxes. Allowing plaintiff to recover all of its lost revenue from defendants, without deducting these expenses, would go beyond the purpose of "restor[ing] the injured party to the position he or she was in prior to the injury." *Id.*[3] Thus, plaintiff is entitled to recover 50 percent of its lost gross revenue, or $68,734.80.

2.

 Plaintiff further contends that the pirate decoders sold by defendants gave subscribers unlimited access to pay-per-view programming. According to Joseph Flaim, a typical cable subscriber views 10 movies per month at a cost of $3.95 each, and five special events per month at an average cost of $15.00 each, for a total of $114.50 per month in pay-per-view charges. (Tr. 65, 70–71). This deprived plaintiff of $335,256.00 in additional revenues.[4]

As the Court observed during trial, this testimony is based on nothing more than rank speculation. Damages must be proved by competent evidence with reasonable certainty. *Ganz v. Lyons Partnership, L.P.,* 961 F.Supp. 981, 991 (N.D.Tex.1997). "This means that, at a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of the lost profits can be ascertained." *Id.* (citation omitted); *see also Brown v.*

---

**3.** The Court rejects defendants' argument that plaintiff is not entitled to any recovery because it failed to mitigate its damages. (Def. Post–Trial Brief at 6). Mitigation is an affirmative defense that must be specifically pleaded. *See Ingraham v. United States,* 808 F.2d 1075, 1078 (5th Cir.1987). Defendants failed to plead this defense in their answer. Nor is the issue raised in the Joint Pretrial Order. *See Ganz v. Lyons Partnership, L.P.,* 961 F.Supp. 981, 988 (N.D.Tex.1997) (pretrial order supercedes all pleadings and becomes the operative complaint and answer). As a result, the mitigation defense has been waived.

**4.** Flaim based his damage calculation on the assumption that the 84 pirate decoders purchased in 1999 were used for 24 months and the 76 devices purchased in 2000 were used for 12 months. At $114.50 per month, this translates to lost revenues of $230,832.00 for 1999 and $104,424.00 for 2000.

*Ames,* 201 F.3d 654, 662 (5th Cir.2000) ("Damages must be ascertainable by reference to some fairly definite standard, established experience, or direct inference from known facts.") (citation omitted). The following record excerpts illustrate the problems with Flaim's testimony:

Q: Mr. Flaim, how did you come up with ten movies per month?

A: Typically the system Cablevision offers many more than that. We took a reasonable, mid-level assumption. Typically a family, you know, in my estimation would have the time per month to view ten movies. We offer much more than that, but I felt ten would be reasonable.

(Tr. 87).

\* \* \* \* \* \*

Q: How did you come up with the five sporting events or special events?

A: Typically—I studied the Pay Per View guides, and they all bear out to about that number on a typical month, especially World Wrestling or maybe a concert. Typically that's what each month what's offered.

(*Id.* at 88).

\* \* \* \* \* \*

Q: So you can't say with any reasonable certainty what any particular individual may have watched with respect to Pay Per View, correct?

A: The system offers quite a few Pay Per View events during the course of a typical month. What a person actually watches, I don't know. But I do know they have access to that.

Q: I understand they have access. But you can't say with any reasonable certainty how many actual events they watched, can you?

A: No. But again, they have access to it. So they're not supposed to.

Q: Let me repeat the question. I understand they have access to programming. My question is this. You can't say with any reasonable, reasonable certainty how many programs any given viewer actually watched on Pay Per View?

A: That's correct.

(*Id.* at 90–91).

\* \* \* \* \* \*

Q: Have you gone through your records and determined what a typical Cablevision customer used in the way of Pay Per View events on a monthly basis? You've either done that or you haven't.

A: Regarding this particular case, I have not.

Q: You have not?

A: No.

Q: Have you done it in connection with any other case?

A: I have gone through people's Pay Per View history in other cases, yes.

(*Id.* at 92–93).

\* \* \* \* \* \*

Q: Tell me again how you came up with ten movies and five higher priced events?

A: Ten represents a mid-level, our accounting, there are typically people that view for. It represents an average of what is available to a subscriber of Cablevision.

Q: Meaning that, what, there are a total of 20 movies at $3.95 that are available, so you picked ten?

A: I picked a reasonable assumption . . . I thought ten would be reasonable, a reasonable number in my estimation.

Q: Based on what?

A: The fact that typical viewing habits are such, you know, that people have time for ten movies.

Q: What's that assumption based on?

A: *Well, I used myself.*

(*Id.* at 95–96) (emphasis added).

With all due respect to the Flaim family, the Court is unable to equate their personal viewing habits with that of the typical cable subscriber.[5] In fact, Flaim's testimony was contradicted by plaintiff's other witness, Stan Durey, who opined that the typical cable customer with access to pay-per-view watches between two and five programs per month. (*Id.* at 38). This further undercuts the "reasonableness" of Flaim's assumptions. Consequently, plaintiff has failed to prove actual damages resulting from the loss of pay-per-view revenue.

### B.

■ Plaintiff also seeks to recover "any profits of the [defendants] that are attributable to the violation which are not taken into account in computing the actual damages." 47 U.S.C. § 553(c)(3)(A)(i). The parties agree that there is no evidence that defendants realized any profits from the sale of pirate decoders to customers in New York, New Jersey, or Connecticut. Nevertheless, plaintiff maintains that it is entitled to $393,497.25 in gross revenues received by defendants from the sale of decoders outside of its franchise area. (Plf.Exh. 6).[6]

This argument is based on the legislative history of section 553(c)(3)(A), which states in relevant part:

The aggrieved party, pursuant to (3)(A)(i), may recover actual damages and all profits of the violator attributable to the violation, *including those profits attributable to the violation where it also occurred outside of the local area of the individual cable system, that are not taken into account in calculating actual damages.*

H.R. 98–934, 98th Cong., 2d Sess. 85 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4722 (emphasis added). Based on this italicized language, some courts have allowed aggrieved parties to recover all profits derived from the sale of pirate decoder devices regardless of whether the sale was made in the cable operator's franchise area. *See CSC Holdings, Inc. v. KDE Electronics Corp.,* 2000 WL 284005 at * 5 (N.D.Ill. Mar. 13, 2000); *Time Warner Entertainment/Advance–Newhouse Partnership v. Worldwide Electronics, L.C.,* 50 F.Supp.2d 1288, 1300–01 (S.D.Fla. 1999); *Time Warner Cable of New York City v. Cable Box Wholesalers,* 920 F.Supp. 1048 (1996) (unreported). *But see CSC Holdings, Inc. v. J.R.C. Products Ind.,* 2001 WL 315189 at *11–12 (N.D.Ill. Mar. 29, 2001) (refusing to follow *Worldwide Electronics* on grounds that actual damages and profits are primarily alternative measures of damages). These courts reason that "Congress intended that a cable pirate's profits were to serve as an incentive to an aggrieved cable operator who acted in the interests of all cable operators by civil prosecution of such decoder seller." *Worldwide Electronics,* 50 F.Supp.2d at 1300.

---

**5.** An informal survey of chambers staff suggests that the typical cable customer watches no pay-per-view movies and no special events. The results of this survey are no more or less reliable than the study undertaken by Flaim.

**6.** The statute provides that "in determining the violator's profits, the party aggrieved shall be required to prove only the violator's gross revenue, and the violator shall be required to prove his deductible expenses and the elements of profit attributable to factors other than the violation ..." 47 U.S.C. § 553(c)(3)(A)(i). Defendants did not offer any evidence of their deductible expenses. Therefore, the gross revenue received by defendants equals their profit.

This Court declines to give the statute such a broad interpretation. Nowhere in the legislative history to section 553(c)(3)(A) does it appear that Congress intended to give cable operators added incentive to act as "private attorneys general" by allowing the recovery of all profits realized by a violator without regard to the specific conduct at issue. To the contrary, Congress expressly indicated that an aggrieved party may recover "all profits of the violator *attributable to the violation,* including those profits *attributable to the violation* where it also occurred outside the local area of the individual cable system ..." 1984 U.S.C.C.A.N. at 4722 (emphasis added). It is the "violation" that makes a party "aggrieved" under statute. Stated differently, a cable operator cannot be "aggrieved" by the sale of a decoder that did not result in the loss of revenue. The "violation" referred to in the legislative history as a precondition to the recovery of profits is further qualified by the requirement that it "*also* occur[ ] outside of the local area of the individual cable system." This suggests that a violation outside a cable operator's local service area is not separate and distinct from a violation within the area. It might encompass a situation, for example, in which a defendant who sold pirate decoder devices in a service area also sold decoders outside the area knowing they would be brought into the local area for use. Under such circumstances, an aggrieved cable operator would be entitled to recover all profits realized from the sale of decoders both inside and outside its local service area. In any event, the Court is unwilling to countenance the recovery of profits that have absolutely no connection to the violations made the basis of the underlying suit. Accordingly, plaintiff is not entitled to these damages.

## C.

Section 553(c)(3)(B) allows the court to award enhanced damages not to exceed $50,000 if "the violation was committed willfully and for the purposes of commercial advantage or private financial gain." 47 U.S.C. § 553(c)(3)(B). At trial, defendants stipulated that their actions were willful and for the purpose of commercial advantage. (Tr. 8). Nevertheless, defendants argue that "Plaintiff has more than an adequate remedy at law, and the Defendants' conduct does not rise to the level where the imposition of punitive damages would be appropriate." (Def. Post–Trial Brief at 6).

The Court finds that plaintiff is entitled to the full amount of enhanced damages in this case. Theft of cable services is a national epidemic with far-reaching consequences. The loss of revenue to cable operators impacts their ability to purchase and maintain high quality programming and reduces the amount of franchise fees paid to government entities. Maintenance of unauthorized connections and the use of pirate decoder devices may result in signal leakage which violates FCC regulations. This may subject a cable operator to fines and other sanctions. *See generally, KDE Electronics,* 2000 WL 284005 at *2. These considerations, among others, undoubtedly led Congress to authorize the imposition of enhanced damages for willful violations of section 553(a)(1).

The evidence adduced at trial shows that defendants advertised their illegal decoders nationwide in publications such as *Popular Science* magazine. (Def.Exh. T). Defendants sold their decoder devices to customers in New York, New Jersey, Connecticut, Massachusetts, Pennsylvania, Ohio, and Michigan. (Def.Exhs. A, B, D, E, I, J, K, & M). The profit margin on these sales was substantial. (Tr. 42–44, 51–55). Although defendants had not been

in business long, there is no reason to believe they would have ceased their illegal operations had plaintiff not intervened. Moreover, defendants' stipulation that their conduct was willful is evidence of "a disregard for the governing statute and an indifference to its requirements." *J.R.C. Products,* 2001 WL 315189 at *12; *see also General Instrument Corp. v. Nu–Tek Electronics & Manufacturing, Inc.,* 1997 WL 325804 at *3 (E.D.Pa. June 4, 1997), *aff'd,* 197 F.3d 83 (3rd Cir.1999). Considering all these factors, the Court concludes that plaintiff is entitled to $50,000 in enhanced damages.

### D.

■ Finally, plaintiff seeks a permanent injunction to prevent future violations of section 553(a)(1) and to permit the destruction or disposal of pirate decoders seized from the defendants. The Court is authorized to grant injunctive relief "on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1) ..." 47 U.S.C. § 553(c)(2)(A). "Where express authority for issuance of statutory injunctions is provided by legislative enactment, an injunction may issue without resort to the traditional 'equitable' prerequisites of such relief, so long as the statutory conditions are met." *KDE Electronics,* 2000 WL 284005 at *6; *see also J.R.C. Products,* 2001 WL 315189 at *14 (citing cases). Thus, the Court may issue a permanent injunction when liability under the statute has been established. *See KDE Electronics,* 2000 WL 284005 at *7; *General Instrument Corp. v. Nu–Tek Electronics & Manufacturing, Inc.,* 3 F.Supp.2d 602, 607–08 (E.D.Pa.1998), *aff'd,* 197 F.3d 83 (3d Cir.1999).

■ Defendants argue that injunctive relief is not appropriate because there is no evidence that they have violated the preliminary injunction or will continue to violate the statute. This argument rings hollow. Defendants acted with impunity before they were enjoined from violating section 553(a)(1). The fact that defendants obeyed the preliminary injunction does not necessarily mean they will comply with the law in the absence of such an order. Accordingly, defendants are permanently enjoined from engaging in the conduct prohibited by the preliminary injunction. *Nu–Tek Electronics,* 3 F.Supp.2d at 607 & n. 3.

■ Plaintiff is also entitled to an order authorizing the destruction or disposal of pirate decoder devices. Defendants have presented no evidence that these products have any lawful purpose. *See KDE Electronics,* 2000 WL 284005 at *5; *Worldwide Electronics,* 50 F.Supp.2d at 1298–99. Since defendants are permanently enjoined from manufacturing, modifying, possessing, or selling pirate decoders, there is no legitimate reason for these devices to be returned to them. *See J.R.C. Products,* 2001 WL 315189 at *15.

### CONCLUSION

Plaintiff is entitled to a judgment against Defendants New Information Technologies, Inc. d/b/a Cable Mart, Jonathan Arakelian, Riaz Sajwani, and Raja Mustafeez, jointly and severally, for actual damages in the amount of $68,734.80 and enhanced damages in the amount of $50,000. Defendants are permanently enjoined from manufacturing, modifying, possessing, or selling non-addressable and/or fully descrambling devices, and plaintiff is authorized to destroy or dispose of the pirate decoders in its possession.

The parties are directed to submit a proposed final judgment to chambers by ***July 11, 2001.*** The judgment must be approved as to form and signed by all counsel of record. The parties are also

directed to confer on the amount of costs and attorney's fees to be awarded to plaintiff. If this issue cannot be resolved by agreement, plaintiff may file an application for fees and expenses within 14 days after the judgment is entered. *See* FED.R.CIV.P. 54(d).

SO ORDERED.