**COLUMBIA CABLE TV COMPANY, INC., Plaintiff,**

v.

**Fred McCARY, Individually and d/b/a Fast Freddies, Defendant.**

**Civil Action No. 3:95–2182–17.**

United States District Court, D. South Carolina, Columbia Division.

July 25, 1996.

Frank Rogers Ellerbe, III, John Samuel Taylor, Robinson, McFadden & Moore, Columbia, SC, Joseph M. Bagley, Wisler, Pearlstine, Talone, Craig Garrity & Potash, Blue Bell, PA, for Plaintiff.

David Edward Belding, Columbia, SC, for Defendant.

## MEMORANDUM OPINION AND ORDER AS MODIFIED BY ORDER ON MOTION FOR RECONSIDERATION

JOSEPH F. ANDERSON, Jr., District Judge.

This is an action by the plaintiff, Columbia Cable TV Company, Inc. against Fred McCary for selling unauthorized cable descrambling devices. The complaint alleges two federal statutory claims and one state common law claim. The matter was tried to the court on July 19, 1996.

After receiving the testimony, carefully considering all the evidence, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52. The court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

### FINDINGS OF FACT

Plaintiff, Columbia Cable TV Company, Inc. d/b/a CVI ("CVI"), is a corporation organized under the laws of the State of South Carolina with a place of business located at 1117 "B" Avenue, West Columbia, South Carolina. Defendant, Fred McCary, is an adult individual who resides at 836 Old Orangeburg Road, Lexington, South Carolina.

At all times material hereto, CVI was a franchised cable operator within the meaning of Title 47 U.S.C. § 522(4) engaged in the business of providing cable television services to customers in West Columbia and vicinity. CVI provided cable television services throughout the Columbia, South Carolina region, including Defendant's place of residence in Lexington, South Carolina. The cable television services provided by CVI include basic cable, premium, and pay-per-view ("PPV") programming. Basic service is provided to CVI's subscribers for a set monthly fee whereas premium channels (*e.g.* HBO, Cinemax, Showtime, etc.) are available for additional monthly fees and PPV movies and events are sold on a per program basis, with fees ranging from $2.99 to $54.99. Each subscriber is entitled to receive only that level of programming services selected by the subscriber and authorized by CVI for

which the subscriber pays in advance or becomes obligated to pay.

The programming signals for all of CVI's cable television services are transmitted from CVI's headend facilities to subscriber homes and businesses through a network of cable wiring and transmitting equipment (the "CATV System").[1]

In order for a subscriber to receive premium and PPV cable programs on his or her television, CVI provides each subscriber with a device known as an addressable cable signal converter/descrambler ("CSCD") which the subscriber rents from CVI for a nominal monthly fee. "Addressable" describes the capability of CVI to remotely control subscriber access to premium and PPV programming by sending computer commands or electronic signals to a subscriber's CSCD directing it to descramble only those cable television services the subscriber has already paid for or is otherwise authorized to receive. Each CSCD is connected to the cable wire in the subscriber's home so that CVI's cable programming signals pass through the cable to the CSCD and into the subscriber's television.

All premium and PPV programming is encoded or "scrambled" before it is transmitted over the coaxial cable to subscribers' homes. A "scrambled" program cannot be viewed by a subscriber on his or her television. Scrambling is the principal security method employed by CVI to prevent subscribers from receiving services for which they have not paid or become obliged to pay.

When a subscriber is authorized by CVI to receive premium and PPV programming, an electronic signal is sent to that subscriber's CSCD directing it to descramble only those premium channels or PPV programs for which the subscriber has paid or becomes responsible to pay. All of the other premium and PPV programming for which the subscriber has not agreed to pay remains scrambled.

To protect the security of its system, CVI requires that all subscribers who receive premium and PPV programming use the CVI supplied addressable CSCDs. For the same reason, CVI has never allowed subscribers to use any other devices to receive programming, including those sold by the defendant.

In 1994 and 1995, the defendant purchased approximately ninety (90) "FTV-3" cable signal descramblers, also known as "decoders", for forty-three dollars ($43.00) each and approximately 250 "TVT" cable signal decoders for thirty dollars ($30.00) a piece. The defendant purchased the "TVT" decoders from Add–On Cable Company, whose advertisement was introduced by the defendant and which states that its products will "access all premium and basic channels. So, if you are tired of the rising cost of cable TV ..."

The defendant admits that from April 1994 to April 1995 he sold the decoders to customers for between forty dollars ($40.00) and one hundred dollars ($100.00) each from his Lexington, South Carolina home, from his West Columbia video poker business, and from the trunk of his car. Defendant had no authorization from CVI to distribute these decoders in CVI's franchise area, to in any way assist the interception and receipt of any communication service offered over plaintiff's cable system, or to distribute instructions for the installation of equipment onto the CVI cable system.

In his deposition,[2] defendant testified that he did not have any "sales pitch" for the devices he sold. People would simply walk up to him and ask him if he "had a box and [he] would say 'Yes, sir, here it is'".

1. In a timely motion under Rules 59(e) and 52(b) of the Federal Rules of Civil Procedure, plaintiff asked the court to modify its findings to include Proposed Finding Number 34. This proposed finding states that these signals "retain their character as radio communications upon retransmission by way of coaxial cable." As plaintiff notes, defendant stipulated to this particular "Finding of Fact." The court, however, views the particular statement contained in this Proposed Finding to be in the nature of a Conclusion of Law. For the reasons discussed in this court's Findings and Conclusions, this court does not agree with that legal conclusion and will not, therefore, adopt this finding regardless of how it is characterized.

2. Selected portions of defendant's deposition were admitted at trial as plaintiff's exhibit 45.

In addition to selling customers the TVT and FTB–3 descramblers/decoders, Defendant provided them with a diagram entitled "Installation Instructions for Converter and Add–On Descrambler." These instructions explained how to install the decoders purchased from the defendant.

█ Defendant claimed that he would also provide customers with, at first, an oral and then later, a written disclaimer to protect himself from responsibility for illegal use. The disclaimer the Defendant claimed to have received from one of his suppliers, and which he subsequently claimed to have distributed to his purchasers, stated:

**DECLARATION OF AUTHORIZED USE:**

I, the undersigned, do hereby declare under penalty of perjury that all products purchased, now and in the future, will only be used on cable TV systems with proper authorization from local officials or cable company officials in accordance with all applicable state and federal laws.

**FEDERAL AND VARIOUS STATE LAWS PROVIDE FOR SUBSTANTIAL CRIMINAL AND CIVIL PENALTIES FOR UNAUTHORIZED USE.**

Defendant's Exhibit–3.

This court does not find that the disclaimer negates any intent to assist others in the unauthorized access of cable programming. In fact, the court finds that the disclaimer demonstrates knowledge of the most probable if not only use of the devices.

In his deposition, defendant admitted that he was a subscriber of CVI. In response to the question of whether he used any of the decoders in his own residence, he conceded "that would be illegal." Although plaintiff asserted at trial that he only knew that such use was illegal as of the time of the deposition, the court finds that defendant was aware of the illegality of the use at the time he was selling the devices.

Defendant claimed that all devices found on his premises by police in April, 1995 were inoperable, had been returned by purchasers due to their dissatisfaction, and were in the process of being shipped back to his suppliers. Defendant had replaced any decoders that did not work or for which his subscribers were not satisfied. Defendant stated that all sales by him were conducted in cash and that no sales tax was paid for the sale of the devices.

On April 5, 1995, an undercover police officer entered the defendant's video poker business and purchased a decoder from him for $125. No disclaimer was provided to the undercover police officer.

Defendant was convicted on May 11, 1995 of selling an unauthorized device to descramble cable television signals to the undercover police officer, a violation of the South Carolina Theft of Cable Television Service Act, § 16–11–8440. Defendant was apparently not timely informed of the trial but did not appeal the judgment.[3]

CVI's Staff Engineer in Columbia, South Carolina, Glen Coette, tested 29 decoders seized from defendant by the police on April 12, 1995, as well as the decoder purchased by the undercover police officer on April 5, 1995. The 30 decoders tested were the same models as those sold by the defendant in 1994–95, models "FTB–3" and "TVT–3G."

Of the 29 decoders tested, 12 were fully operational on the CVI System. Each of the 12 operable devices automatically descrambled all of the premium and PPV programming offered over the CVI system and did so without the knowledge or authorization of the cable operator. Unlike the CVI supplied addressable CSCDs, the defendant's decoders are not addressable and automatically descramble all scrambled programming offered over CVI's cable television system without authorization. Of the remaining 17 devices tested, 14 had the correct chip installed to access the CVI system, but were inoperable due to electronic faults such as defective wiring, etc.

Defendant distributed his decoders for the purpose of allowing the unauthorized access of cable television programming services.

---

**3.** This court has given little weight to this conviction as the elements are not identical to the present claim. This court would reach the same result in the absence of this conviction.

The instructions distributed by the defendant, when used in conjunction with the operable devices recovered from him, would permit the receipt of all of CVI's premium and PPV programming without CVI's consent and without payment for same. The instructions distributed by defendant further demonstrate that he sold his devices with the intent of assisting others in receiving cable television services without authorization.

■ This court concludes that the defendant distributed devices or equipment designed for the unauthorized receipt of cable programming services with the intent of assisting others in the receipt of cable programming services. The defendant did so without the authorization of CVI, or any other cable operator. Defendant's distribution of decoders was committed willfully and for purposes of private financial gain.

## CONCLUSIONS OF LAW

CVI is a person aggrieved within the meaning of 47 U.S.C. § 553(c). By distributing pirate decoders, defendant violated 47 U.S.C. § 553.

■ The court finds in favor of plaintiff and against defendant on Count I of the Amended Complaint for violation of 47 U.S.C. § 553(a). The court hereby enters a permanent injunction against defendant directing that he refrain from selling or otherwise distributing any equipment intended for unauthorized reception of any communication service offered over a cable system.

■ Pursuant to the damages provisions of 47 U.S.C. § 553(c)(3)(A)(ii), this court has discretion to award statutory damages ranging from $250 to $10,000 "for *all* violations involved in this action." (emphasis added). "For purposes of all penalties and remedies established for violations of subsection (a)(1) of this Section, the prohibited activity established herein as it applies to each such device shall be deemed a separate violation." 47 U.S.C. § 553(b)(3). Where the violation is willful and for the purpose of private finan-

cial gain, the court can increase the award by an amount not to exceed $50,000. 47 U.S.C. § 553(c)(3)(B).

In this case, the court concludes that a penalty in the amount of two hundred and fifty dollars ($250.00) for each of the 340 decoders distributed by the defendant plus an additional award of statutory damages of twenty-five dollars ($25.00) for each such decoder due to the willful nature of the offense, for a total award of ninety-three thousand, five hundred dollars ($93,500.00) plus costs (but not including attorneys fees), is appropriate.

The court believes this penalty is an appropriate and adequate amount in light of all the circumstances of this case. In particular, although the court found that defendant "distributed" all 340 devices ordered by him, it is also apparent that a number of these were replacements for boxes which did not work properly and that any benefit defendant derived from this illegal course of conduct will be outweighed many times over by the amount of the penalty here imposed. Further, while it is impossible to determine, to any degree of certainty, the actual losses resulting to plaintiff as a result of this conduct (because it cannot be known how many of these boxes were actually used, for how long, and whether they were, in fact, used in plaintiff's service area), this court believes that the penalty awarded, if paid, is likely to be a reasonable approximation of plaintiff's losses resulting from defendant's activities.

The court has taken the cost of prosecuting the present action into consideration in awarding this amount and, therefore, declines to award attorney's fees under 47 U.S.C. § 553(c)(2)(C).

For the reasons stated in *United States v. Norris*, 88 F.3d 462 (7th Cir.1996), this court finds that 42 U.S.C. § 605 is not applicable to this action.[4] Were this court to determine otherwise, it would award damages as close as permissible to the amount awarded under § 553.

---

4. The Fourth Circuit has not addressed the critical issue of whether 42 U.S.C. § 605 applies to theft of cable services at the point of delivery. The Second and Seventh Circuits have reached different conclusions. *Compare Norris supra* with *International Cablevision, Inc. v. Sykes*, 75 F.3d 123, 131–33 (2d Cir.1996).

Plaintiff has indicated an election to receive statutory damages under § 553 as preferable to an award under its conversion cause of action. The conversion claim presents numerous difficult issues including but not limited to the issue of proper calculation of actual damages. The court does not, in any case, believe such damages along with any punitive award that might be issued would exceed the amount awarded under § 553. The court declines, therefore, to resolve this claim.

Wherefore, it is ordered that plaintiff shall have judgment against defendant in the amount of $93,500 plus costs under its first cause of action. The court declines to award attorney fees. The court denies judgment under plaintiff's second cause of action and declines to reach the third cause of action based on the election of remedies doctrine.

IT IS SO ORDERED.