TIME WARNER ENTERTAIN-MENT/ADVANCE–NEWHOUSE PARTNERSHIP d/b/a **Time Warner Cable, Plaintiff,**

v.

**WORLDWIDE ELECTRONICS, L.C.** d/b/a **Worldwide Electronics, Nation-wide Electronics, Inc.** d/b/a **Nation-wide Electronics, Alan Marks, Lewis Schneiderman, Susan Marks** a/k/a **Susan Mann, Audrey Schneiderman, John Does 1–10, Jane Does 3–10, Unidentified Corporations 1–10 and Unidentified Business Entities 1–10, Defendants.**

No. 98–6118–CIV.

United States District Court,
S.D. Florida.

Jan. 26, 1999.

Ronald E. D'Anna, Mattlin & McClosky, Boca Raton, FL, Daniel J. Lefkowitz, Patrick Sullivan, Jericho, NY, for Plaintiff.

Frederick A. Cary, The Cary Law Firm, Rancho Santa Fe, CA, for Defendants.

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

RYSKAMP, District Judge.

THIS CAUSE came before the Court upon the plaintiff, Time Warner Entertainment/Advance Newhouse Partnership d/b/a Time Warner Cable's ("TWEAN" or "plaintiff") motion for summary judgment on its claims against some of the defendants under the Cable Communications Policy Act of 1984, as amended (47 U.S.C. § 553). The defendants Worldwide Electronics, L.C. ("Worldwide"), Nationwide Electronics, Inc. ("Nationwide"), Alan Marks ("Marks") and Lewis Schneiderman ("Schneiderman"), against whom the motion was directed, responded and TWEAN thereafter replied. The parties subsequently waived oral argument and the Court considers the motion ripe for adjudication.

As set forth below, the Court grants summary judgment to TWEAN with re-

spect to its claims under 47 U.S.C. § 553(a)(1) against Worldwide, Nationwide, and Marks,[1] and grants recovery to TWEAN and against the defendants, jointly and severally, of its actual damages and defendants' profits pursuant to 47 U.S.C. § 553(c)(3)(A)(1), the additional sum of $50,000.00 in enhanced damages under 47 U.S.C. § 553(c)(3)(B), a permanent injunction pursuant to 47 U.S.C. § 553(c)(2)(A) against these defendants, and an award of attorneys' fees and costs in this action pursuant to 47 U.S.C. § 553(c)(2)(C). The Court will subsequently schedule a conference to address the parties' submissions with respect to determination of the precise amount of actual damages suffered by TWEAN, the defendants' profits, and the attorneys' fees and costs to be awarded.

## I. BACKGROUND

The largely undisputed facts most relevant to TWEAN's claims for relief under 47 U.S.C. § 553[2] are as follows:

### A. The Plaintiff and its Business

TWEAN operates cable television systems throughout the United States pursuant to franchises awarded to it by various governmental entities and has an approximate total of 7.5 million subscribers. TWEAN offers cable television programming to subscribers who request and pay for the same. *See* Mahoney Aff. ¶ 3. TWEAN's Albany, New York system has been primarily responsible for bringing and prosecuting this action.

TWEAN's programming is offered to its subscribers in "packages" of programming services, such as Basic and Standard, which a subscriber may select and receive at a monthly rate. Subscribers may also elect to purchase one or more "premium" programming services, such as Cinemax, Home Box Office and Showtime, for an additional monthly charge per service. *Id.* ¶ 4. TWEAN also offers Pay Per View programming, a service enabling subscribers to purchase individual movies, sporting events, or other entertainment for a per event fee over and above the subscriber's regular monthly subscription fee. *Id.* ¶ 5. Each subscriber is entitled to receive only that level of programming and services that he or she selects and purchases. *Id.* ¶ 6.

TWEAN encodes or "scrambles" the signals for specific programming services, and provides its subscribers who purchase such programming with converter-decoder devices. These devices decode the scrambled signals so that the programming selected and purchased by a particular subscriber can be viewed clearly on the subscriber's television set. Programming services not purchased remain

---

1. In a "Suggestion of Death" served on September 30, 1998, it was represented to the Court that Schneiderman died on August 19, 1998. TWEAN has declined to substitute a party pursuant to Fed.R.Civ.P. 25. Consequently, the claims against Schneiderman are extinguished.

2. In its complaint, TWEAN asserted claims under 47 U.S.C. §§ 553 and 605 with respect to the defendants' pirate decoder sales business. Although there is a split of authority regarding the applicability of Section 605 to cable piracy, *compare International Cablevision, Inc. v. Sykes*, 75 F.3d 123 (2d Cir.1996), *cert. denied*, 519 U.S. 929, 117 S.Ct. 298, 136 L.Ed.2d 217 (1996) ("*Sykes II*") and *United States v. Norris*, 88 F.3d 462 (7th Cir.1996), the two reported decisions on this issue in federal courts in Florida, *Time Warner Cable of New York City v. Freedom Electronics, Inc.*, 897 F.Supp. 1454 (S.D.Fla.1995) and *American Television and Communications Corp. v. Floken, Ltd.*, 629 F.Supp. 1462 (M.D.Fla. 1986), have held that Section 605 is applicable to theft of cable services. In this action, TWEAN, stating its intention to avoid protracted litigation of this issue herein, in light of the dearth of defendants' purported identified assets, consented to the dismissal of its Section 605 claim. However, as the cases decided under the two similar statutes involve identical issues such as intent, this decision cites and discusses case law under both statutes.

scrambled and therefore cannot be viewed on the subscriber's television set. *Id.* ¶ 9. It is possible, however, for a dishonest individual to install an unauthorized or "pirate" decoder/converter unit or "descrambler" (one programmed to descramble all programming services) onto plaintiff's cable system in order to receive all of TWEAN's scrambled premium and Pay Per View programming services, without authorization and without making payment therefor. *Id.* ¶ 11.

TWEAN's system is "addressable," which means that the converter-decoder TWEAN provides to a subscriber is programmed by a central computer to authorize viewing of only those programming services purchased by that subscriber. Each subscriber who purchases services that are scrambled will have his or her decoder programmed by the TWEAN central computer to receive only those services selected and purchased. *Id.* ¶ 12.

## B. The Defendants and their Business

Defendants Worldwide, Nationwide, Marks and Schneiderman, who conducted business at 4400 West Hillsboro Blvd., Suite # 3, Coconut Creek, Florida, were engaged in the business of selling cable television decoders or descramblers for profit. *See* Marks Tr. at 13, 19–23. Marks testified that he and Schneiderman were the owners of Nationwide and Worldwide. *Id.* at 4, 8–9.

Defendants advertised and marketed their products to the plaintiff's cable television subscribers, including but not limited to those serviced by its Albany system, via newspapers, magazines with nationwide circulation, and the Internet, and sold their converter-decoders to persons who called their "800" number and indicated that they were purchasing the devices for use on the plaintiff's cable television system. *See generally* Allen Aff.

## C. The Plaintiff's Investigation of Defendants

In or around November of 1997, the defendants' pirate decoder sales operation came to the attention of TWEAN. Mahoney Aff. ¶ 13. TWEAN's Albany, New York division retained A.C.I. Investigations, Inc. ("ACI") to investigate the defendants and their business. *Id.;* Allen Aff. ¶ 3.

In brief, ACI's investigation consisted of several telephone calls to the defendants, the purchase of three pirate decoders (which the investigator specified would be used in TWEAN's Albany, New York system), and surveillance at the defendants' business location. *See generally* Allen Aff. During the surveillance at the defendants' place of business, ACI observed numerous daily pickups and deliveries by both Federal Express and United Parcel Service of packages which appeared to contain pirate decoding devices. The decoders purchased by TWEAN's investigators were subsequently tested and found to be capable of descrambling and permitting viewing of all of TWEAN's scrambled programming services, including premium and Pay Per View services. Mahoney Aff. ¶ 14–16.

## D. The Present Action

TWEAN's Albany, New York system thereafter took the lead in bringing this action on behalf of TWEAN against the defendants for injunctive relief and monetary damages on account of their manufacture and/or sale and distribution of pirate decoders. At the outset of this action, TWEAN sought on an *ex parte* basis and this Court granted, a temporary restraining order (the "TRO") which, *inter alia,* directed the U.S. Marshal Service to seize the defendants' business records and stock of pirate decoding devices from their business location. The TRO also provided for a restraint on assets pending decision in this action, as well as a prohibition against defendants' future sales of pirate decoding devices. This relief was thereafter confirmed after a hearing in the Court's preliminary injunction dated February 26, 1998.

### E. The Defendants' Position Regarding TWEAN's Summary Judgment Motion

The defendants concede that they sold non-addressable, fully descrambling cable television decoding devices for use on cable systems. Marks Tr. at 20–21. Their position, generally, is that they lacked the intent to assist in the interception of cable television programming services. This position is supported primarily by their use of disclaimers, which advised decoder purchasers that the devices were not to be used illegally. *See* Def.s' Reply to Pl.s' Mot. for Summ. J. at 3–4; Hr'g Tr. at 2–3; 19–20.[3]

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) sets forth the standard governing summary judgment. In its most basic form, summary judgment is appropriate where there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original). An issue of fact is material if it might affect the outcome of the suit under the governing law. *Id.* at 248, 106 S.Ct. 2505. An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the party opposing summary judgment may not simply rely on the pleadings or mere denials of the allegations. Rather, the opposing party must adduce some evidence showing that material facts are in issue. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. "Rule 56(c) therefore requires a non-moving party to go beyond the pleadings and by [its] own affidavits or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Eleventh Circuit has restated the method for allocating burdens in a summary judgment motion. Specifically, in accordance with U.S. Supreme Court precedent,

> The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

## III. DISCUSSION

### A. 47 U.S.C. § 553

Section 553(a)(1) of the Communications Act, enacted in 1984, provides as follows:

---

**3.** The only other "proof" offered to support their opposition to TWEAN's summary judgment motion are their self-serving statements that they did not believe that their pirate decoder sales were illegal. *See e.g., Id.* at 3 ("Also, a review of the complete deposition of Alan Marks ... shows that the defendant did not once indicate that he felt he was violating any laws in selling converters"). *See also* Marks Decl. ¶ 7–11.

No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

*Id.* Put simply, Section 553(a)(1) prohibits the interception and assisting in the interception of any communications service offered over a cable system. *See U.S. v. Coyle*, 943 F.2d 424, 427 (4th Cir.1991) ("[It] was enacted to protect the revenue of television cable companies from unauthorized reception of their transmissions[.]"). Subsection 553(a)(2) defines the prohibition against "assisting" in this activity to include the illegal manufacture and sale of "pirate" descrambling devices:

> For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor of equipment (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

47 U.S.C. § 553(a)(2). Section 553, on its face, applies to the sale of cable television decoders. Indeed, as stated by the House Committee on Energy and Commerce, it is the express focus of this section:

> [P]aragraph (a)(2) is primarily aimed at preventing the manufacture and distribution of so-called "black boxes" and other unauthorized converters which permit reception of cable service without paying for the service. H.R. No. 98–934, 98th Cong.2d Sess. 84 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin. News 4655, 4721.

*Cited in Storer Communications, Inc. v. Mogel*, 625 F.Supp. 1194, 1198 (S.D.Fla. 1985); *Continental Cablevision, Inc. v. Poll*, 124 F.3d 1044, 1046, fn. 2 (9th Cir. 1997). *See also TKR Cable Co. v. Cable City Corp.*, No. 96–2877, 1996 WL 465508 at *5 (D.N.J. July 29, 1996) (Brown, J.).

Since the time of its enactment, Section 553 has been interpreted to prohibit sales of decoder devices identical to those sold by the defendants when the seller possesses specific knowledge or intent that the device will be used for unauthorized reception of cable television programming services. *See e.g., Time Warner Cable of New York City v. Freedom Electronics, Inc.*, 897 F.Supp. at 1459 (S.D.Fla.1995); *Storer Communications*, 625 F.Supp. at 1198; *Poll*, 124 F.3d at 1047; *United States v. Norris*, 88 F.3d at 466; *Int'l Cablevision, Inc. v. Sykes*, 997 F.2d 998, 1003–05 (2d Cir.1993) ("Sykes I"); *Coyle*, 943 F.2d at 427; *United States v. Gardner*, 860 F.2d 1391, 1398–99 (7th Cir.1988), *cert. denied* 490 U.S. 1023, 109 S.Ct. 1751, 104 L.Ed.2d 187 (1989); *Intermedia Partners Southeast v. QB Distributors, L.L.C.*, 999 F.Supp. 1274, 1281 (D.Minn.1998); *Time Warner Cable of New York City v. Cable Box Wholesalers, Inc.*, 920 F.Supp. 1048 (D.Ariz.1996).

Liability under Section 553(a) for selling pirate decoders, requires primarily that the defendants be engaged in the "distribution of equipment intended by the ... distributor ... for unauthorized reception." 47 U.S.C. § 553(a)(2). As discussed below, the business of the defendants at issue in this action is essentially the same as that of most of the defendant pirate decoder sellers which are the subjects of the reported decisions arising under either Section 553 or Section 605, i.e., the sole purpose in defendants' selling descramblers, and in their customers' purchasing them, is to permit or enable these customers to steal cable television programming services from their cable television providers.

### B. Evidence of the Defendants' Intent

Preliminarily, it should be noted that there is no dispute that the defendants

sold non-addressable fully descrambling cable television decoders. *See* Allen Aff. ¶¶ 7, 12 & 17; Marks Tr. at 20–21. In addition, the defendants' business records recovered during the seizure do not suggest that either Nationwide or Worldwide was engaged in any other legitimate business. More specifically, there is no dispute that the defendants sold into TWEAN's Albany, New York franchise areas decoding devices which were compatible with TWEAN's scrambling technology and which, when attached to TWEAN's system, allowed a user to view all of TWEAN's scrambled premium and Pay Per View programming services. *See* Mahoney Aff. ¶¶ 14–16; Allen Aff. ¶¶ 7–20. In their submissions in this action, the defendants did not dispute that the devices sold by them were not addressable by cable operators and that they were capable of descrambling all of a cable operator's scrambled premium and Pay Per View programming services. Indeed, defendant Marks acknowledged that the devices had this capability. *See* Marks Tr. at 20–21.

Having established that the defendants sold pirate decoding devices into TWEAN's franchise area, the Court turns to the issue of intent, the only disputed matter herein regarding liability, and identifies the following indicia of the defendants' intent to assist in intercepting cable service.

### 1. The defendants' decoding devices are non-addressable and fully descrambling

Numerous reported decisions indicate that the best evidence of the defendants' intent is the nature of the non-addressable, fully descrambling decoding devices they sold. As the Court noted in *TKR Cable:*

> As set forth at length herein, this Court finds that the sale of non-addressable decoders with bullet busters, with with

(sic) the seller provides hookup instructions and which the seller represents can "get" all the premium and Pay Per View channels. of a cable television service provider call have only one purpose—to enable the purchaser to receive and unscramble programming services offered by a cable company without notifying the cable company and without paying for the services.

*Id.* at *7. The Court in *Subscription Television of Greater Washington v. Kaufmann,* 606 F.Supp. 1540 (D.D.C.1985) made a similar observation:

> There is only one purpose to be achieved by modifying a decoder device so as to eliminate its addressability function: to enable a user to receive and unscramble an STV signal without notifying the signal provider. Thus, the defendant is selling a decoder that is no longer compatible with plaintiffs' computer and may not be. terminated by its computer. The defendant's "instruction" accompanying the decoder [advising the purchaser] to communicate with the signal provider is therefore worthless.

*Id.* at 1543 (bracketed material added). In *Poll,* the Ninth Circuit affirmed a lower court's finding of Section 553 liability and reaffirmed the holdings in earlier decisions that non-addressable and fully descrambling devices furnish considerable evidence of a pirate decoder seller's intent to assist in the interception of cable services:

> By removing addressability from its converter-decoder devices and modifying them to descramble constant pay-per-view programming, Poll effectively defeated all of Continental's security measures, thereby allowing the user to receive unlimited premium and pay-per-view programming free of charge.

*Id.* at 1047.[4] *See also General Instrument Corp. of Del. v. Nu–Tek Electronics &*

---

4. Defendants' provision of instructions ex-

plaining how to install the device and access

*Mfg., Inc.,* 3 F.Supp.2d 602 (E.D.Pa. 1998) (Gawthrop, J.) at *1 (finding that defendant had converted devices originally manufactured for sale to cable operators for the "unlawful purpose" of descrambling cable signals without a cable operator's knowledge or authorization).[5]

## 2. The defendants' decoding devices have "bullet-busting" capabilities

A handwritten document recovered during the February 9, 1998 seizure at the defendants' business location indicated that the defendants sold devices which had so-called "bullet busting" capabilities. The document, states, in pertinent part: "All boxes have built in surge protectors a.k.a. *bullet* (sic)." Mahoney Aff. at Ex. C. (emphasis in original). Similarly, defendants' Nationwide Electronics catalog describes one of the features of the Jerrold Compatible Super J.A. Impulse Descrambler as follows: "State-of-the-art electronics 'ignores' camouflage signals sent by the cable company, so you get perfectly tuned cable stations every time." *Id.* at Ex. D. In his affidavit, Mr. Mahoney, who is in charge of security for TWEAN's Albany system, states that:

> [M]any pirate decoder sellers market their products as being "bullet proof,"

and market products called "bullet busters." By these terms, pirate decoder sellers indicate to prospective customers that they sell products that will not be detected by a cable company using bullets [software-driven electronic security signals used to combat cable piracy]. Sometimes the decoders by themselves are represented to be "bullet proof." Other times, the decoder purchaser is advised of the possibility of purchasing a "bullet buster," which is a separate filter which can purportedly filter the bullets prior to their reaching the pirate decoder device.

Mahoney Aff. ¶ 3. Numerous decisions discuss the effects of the use of "bullet busters," a term of art in the pirate decoder industry, and confirm that this feature allegedly protects illicit decoders from the electronic bullet software countermeasures used by numerous cable television companies to disable pirate decoders. *See Poll,* 124 F.3d at 1047; *TKR Cable Co.,* 1996 WL 465508 at *2; *Cable Box Wholesalers,* 920 F.Supp. at 1050; *Freedom Electronics,* 897 F.Supp. at 1457; *Coyle,* 943 F.2d. at 425 (similar device, referred to as a "Cable TV Data Blocker," hinders cable companies from discovering the unauthorized use of a descrambler). Significantly, the

---

premium and pay per view services, Allen Aff. ¶ 9d, 14d & 19d, & Ex. "B," "C," & "D," is additional evidence of their intent that their devices would facilitate the theft of services. *See Storer Communications,* 625 F.Supp. at 1200 (noting defendant's provision of installation instructions is conduct which assists in receiving or intercepting cable transmissions); *Sykes I,* 997 F.2d at 1003–4 (same); *Columbia Cable TV Co., Inc. v. McCary,* 954 F.Supp. 124, 128 (D.S.C.1996) ("The instructions distributed by defendant further demonstrate that he sold his devices with the intent of assisting others in receiving cable television services without authorization"); *TKR Cable Co.,* 1996 WL 465508 at *7 (defendants' provision of "hookup instructions" along with device formed part of basis for finding of intent).

5. In defendants' Local Rule 7.5 statement, Marks asserted that to his knowledge, there was no such thing as a pirate decoder. *Id.*

¶ 14(a). However, his extended tenure in the decoder marketplace and the numerous reported decisions (including one from this Court) using this term completely undermine the credibility of his claim. *See Freedom Electronics,* 897 F.Supp. at 1457 ("There is a nationwide, 'black market' industry of various manufacturers, vendors and distributors of "pirate" converter-decoders or descramblers, who market devices and equipment to subscribers of plaintiff's cable television programming services seeking to avoid the payment of subscription fees to view premium and Pay Per View programming services"); *Poll,* 124 F.3d at 1046 (same). *See also Sykes II,* 75 F.3d at 126 (use of terms "pirate decoder"); *Kaufmann,* 606 F.Supp. at 1545 (use of term "pirate decoder"); *TKR Cable Co.,* 1996 WL 465508 at *2 (discussion of pirate decoder).

courts in *Poll* and *TKR Cable* found that bullet busters or bullet protectors offered by pirate decoder sellers which defeat security measures of the cable companies clearly show intent to assist in the theft of cable television services. *Poll*, 124 F.3d at 1047; *TKR Cable Co.*, 1996 WL 465508 at *7.

### 3. The defendants' money back guarantee

The defendants' money back guarantee provides further evidence of their intent. *See, e.g.* Allen Aff.Ex. C, D & E (30 day money back guarantee) For example, a December 30, 1997 letter, sent by electronic mail, from decoder purchaser Roland Mink to the defendants states, "As per your instructions I am returning this box for "no charge" replacement. As we discussed on the phone it would not pick up the premium channel's (sic). You instructed me to return it and you would send a Zenith box just like the one I have." *Id.* at Ex. E. There is a handwritten notation on the letter reading "Paragon Zen/Rem in 1/7/98," suggesting that Mr. Mink would be (or was) sent a replacement on or after January 7, 1998. *Id.* Similarly, the Return Sheet sent by Rodney Diehl on January 23, 1998 states, "The following stations are missing: 68 (Spanish TV), 69 (Showtime), 72 (Pay Per View), 73 (Pay Per View) and 76 (Pay Per View)." *Id.* A handwritten notation on this letter states "Tocom/rem in 2/2/98," suggesting that Mr. Diehl would be (or was) sent a replacement on or after February 2, 1998. *Id.*

The Court in *TKR Cable*, presented with evidence of a similar return policy, stated that "defendants' return policy provides additional evidence of their intent to enable theft of programming services." *Id.*

6. In *Cable Box Wholesalers,* the Court noted the following regarding the defendants' disclaimer defense:

Defendants' catalog included a disclaimer warning the purchaser that it is unlawful to intercept cable signals. The disclaimer in-

at *7. *See also QB Distributors,* 999 F.Supp. at 1280–81.

### C. The Defendants' Arguments

The defendants raise several arguments in support of the contention that there exists a genuine issue of material fact regarding whether the defendants had the requisite intent to assist in the unlawful interception of cable television programming. The Court will consider each argument in turn.

### 1. The defendants' use of disclaimers

The defendants included "disclaimer" provisions and statements with their decoder sales. *See* Allen Aff.Ex. B, C & D. The defendants rely upon the disclaimers to shield them from liability, and attempt to shift culpability to their customers. *See* Hr'g Tr. at 2–3. These disclaimers indicate that the purchaser represents to the defendants that he or she will not use the purchased device illegally and without authorization from his or her cable company.

However, every reported decision regarding this "disclaimer" defense to claims under either Section 553 or 605 has held that such disclaimers in no way shield descrambler sales operations from liability. *See, e.g., QB Distributors,* 999 F.Supp. at 1282; *TKR Cable,* 1996 WL 465508 at *7; *Gardner,* 860 F.2d at 1395; *ON/TV of Chicago v. Julien,* 763 F.2d 839, 844 (7th Cir.1985); *Cable Box Wholesalers,* 920 F.Supp. at 1053; *Freedom Electronics,* 897 F.Supp. at 1459; *Oceanic Cablevision, Inc. v. M.D. Electronics,* 771 F.Supp. 1019, 1025 (D.Neb.1991); *Kaufmann,* 606 F.Supp. at 1542–3.[6] Indeed, courts have found that a pirate decoder seller's use of

forms the customer that the local cable company should be contacted for authorization prior to installing the decoder. At the preliminary injunction hearing, Time Warner's Director of Signal Security testified that in the 5½ years he had been involved in

such disclaimers reflects their awareness of the illegality of their business. *See, e.g., Columbia Cable TV Co.,* 954 F.Supp. at 127 ("This court does not find that the disclaimer negates any intent to assist others in the unauthorized access of cable programming. In fact, the court finds that the disclaimer demonstrates knowledge of the most probable if not only use of the devices.").[7]

### 2. The defendants' decoders have lawful uses

The defendants assert that there are other reasons for purchasing pirate decoders aside from use in stealing cable television services. For example, their advertisements state "Why Rent?" This purported legitimate reason for purchasing a decoder is simply not credible or compelling. The descramblers sold by the defendants cost as much as $399.00. The F.C.C. regulated monthly equipment rental fee charged by TWEAN is $3.17 (these fees are assessed oil an actual cost basis). *See* Mahoney Aff. ¶ 4. In order to recoup his or her investment in a pirate descrambler for the purpose of avoiding such rental charges, a purchaser would need to use the pirate decoder purchased from the defendants for

more than 10 years (putting aside matters of interest and the present value of money, as well as the reality that even a legitimate decoder has a useful life of approximately 7–10 years before malfunctioning or being made obsolete by evolving, incompatible technology).

The *Cable Box Wholesalers* Court, presented with similar arguments, rejected them as follows:

> Because the two decoders sold by defendants to Time Warner's investigator cost $728.00, the rental fees charged by Time Warner for a decoder is $2.90 per month, and decoders have a useful life of 7–10 years, defendants' argument that customers purchased Cable Box decoders to avoid rental fees is unpersuasive.

*Id.* at 1053.[8]

Also unpersuasive are defendants' arguments that customers purchase their decoders to avoid potential liability to the cable company for lost, stolen or damaged equipment to restore such TV functions as remote volume control, picture-in-picture, or parental lockout.

*Id.* at 1053 fn. 7.[9] *See also Poll,* 124 F.3d at 1048 ("the fact that Poll's boxes had legal uses does not insulate it from civil liability

---

cable security, he has never received a call from a customer informing Time Warner that a customer purchased a decoder and wanted authorization for its use. *Id.* at 1050. Similarly, in *Kaufmann,* 606 F.Supp. at 1543, the plaintiff cable company therein noted that no pirate decoder purchasers had ever contacted it as directed by the defendant's disclaimers ("The defendant Kaufmann has asserted that he was selling from 30 to 40 decoders per week in the Washington metropolitan area. To date, the plaintiffs have never been contacted by any of these purchasers to arrange for payment of the monthly fee."). Moreover, in *Kaufmann,* the Court noted that, as a non-addressable decoder was not detectable on a cable system, the defendant's "instruction" accompanying the decoder [advising the purchaser] to communicate with the signal provider was "therefore worthless." *Id.*

7. *See also United States v. Gardner,* 860 F.2d 1391, 1396 (7th Cir.1988) ("Whatever the at-

tempted legal effect of the defendant's disclaimer, the ultimate trier of fact could easily find that *it was a transparent attempt to deny the patent illegality of the defendant's acts ...*" (*citing ON/TV of Chicago v. Julien,* 763 F.2d 839, 844 (7th Cir.1985)) (emphasis added)).

8. *See also QB Distributors,* 999 F.Supp. at 1281–82 (*citing Cable Box Wholesalers* discussion with approval).

9. The defendants also make the arguments rejected in *Cable Box Wholesalers. See* Marks Decl. at ¶ 14 f. ("I disagree with paragraphs 23–25 [of TWEAN's Local Rule 7.5 statement] in that it misstates the reasoning under which most people purchase their own converters; that is, better reception, more features, better remote controls, better integration with home theater systems.")

where the evidence establishes that Poll knew and intended the "black boxes" to be used for the unauthorized interception of cable television programming").

### 3. The plaintiff's have not established that the defendants' decoders were actually used for illegal purposes

The defendants also argue that they cannot be held liable under Section 553 absent proof that purchasers other than TWEAN's investigators used the pirate decoders sold by defendants to intercept cable television services. This argument has been repeatedly rejected, as Section 553 only requires *intent* to assist in the unauthorized interception of communications offered over a cable system (by selling pirate decoders) and proof of actual interception by purchasers is not required. *See Gardner*, 860 F.2d at 1397 ("On its face, the statute does not require actual use by the distributor or purchaser"); *QB Distributors*, 999 F.Supp. at 1281 ("defendants cannot avoid a finding of specific knowledge and intent simply because Intermedia cannot prove particular subscribers actually used the devices illegally."). In response to a similar argument, the court in *General Instrument Corp. v. Nu–Tek Electronics & Mfg., Inc.*, 3 F.Supp.2d 602, stated the following:

> Nu–Tek also argues that GI failed to present evidence that the cable subscribers using Nu–Tek boxes were unauthorized to receive cable services, and that,

to prevail, GI must prove such unauthorized reception. But the issue is not whether service was illegally received. Proof that a cable subscriber used a non-addressable cable device without authorization is unnecessary to establish a violation of § 553(a). As to manufacturers and distributors of cable boxes, the plaintiff must only show facts sufficient to prove an intent to assist customers in unauthorized reception.

*Id.* at 609 (citations omitted). *See also U.S. v. Beale*, 681 F.Supp. 74, 75 (D.Me. 1988) ("The language of section 553, its legislative history, the limited case law interpreting section 553, and similar precursor statutes, all lead to the conclusion that proof of *actual* interception or reception is unnecessary, provided there has been proof of willful manufacture or distribution of equipment intended for unauthorized use in the interception or reception of a cable communications service."); *Storer Communications, Inc. v. Mogel*, 625 F.Supp. at 1200 ("The Court further concludes that defendants' defense that only the use of such equipment is illegal, rather than its sale or distribution, is totally without merit.").

The Court also takes note that, in response to TWEAN's summary judgment motion, the defendants failed to produce any objective evidence of the legality of their business, as opposed to their stated intent and belief.[10] This conspicuous absence of evidence to support defendants' self-serving assertions regarding the sup-

---

10. The defendants argue that a cable company can prevent theft of its services by placing a trap on a pirate decoder purchaser's line to prevent pay per view signals from being received. *See* Marks Decl. at 12. Aside from the fact that pirate decoder purchasers do not tell their cable providers about their use of the device, the argument that cable operators must use other means of protecting their signals in addition to the millions of dollars invested in their scrambling technology was expressly rejected in *TKR Cable Co.*:

> Defendants also argue that the plaintiff has other means of protecting the services of-

fered by it from theft besides scrambling those programming services for which a subscriber has not paid. However, this Court rejects defendants' very cynical position that plaintiff cannot rely upon one reasonably effective method of protecting the services offered by it, and must instead use every available means, no matter how expensive, impractical or redundant, to secure its signals, in order to have standing to recover for theft of its services. *Id.*, 1996 WL 465508 at *8.

posed legality of their business is similar to that noted by the Court in *Cablevision Systems Corp. v. Muneyyirci*, 876 F.Supp. 415, 419 (E.D.N.Y.1994). In *Muneyyirci*, the Court, in granting summary judgment under 47 U.S.C. § 605 for 390 sales of pirate decoders, expressly relied upon the failure of the defendants therein to make any showing of the legality of their business:

> Most telling is the defendants' failure to challenge plaintiff by introducing *any* evidence suggesting that certain sales were legal—not one invoice, not one purchaser, not one affidavit, not one record of any kind establishing legitimate sales to an authorized distributor, or anyone.

> \* \* \* \* \* \*

> The defendants have simply not produced any evidence of legitimate sales of decoders or combination units. Their failure to present any evidence of legitimacy, in the face of Cablevision's convincing presentation, including evidence that there is no legitimate retail market for the decoders and combination units, leads the Court to conclude that there is no genuine issue of fact with respect to the legitimacy of sales of single decoders or combination units to individuals.

*Id.* at 419 (emphasis in original). The defendants also did not produce evidence that they had the required FCC approval to manufacture, distribute or market converter-decoders for a cable system, furnishing additional evidence of their intent or knowledge that their devices would be used to receive unauthorized programming. *See Poll*, 124 F.3d at 1046, 1047.

█ In sum, in light of the overwhelming indicia of the defendants' intent to intercept the cable services offered by the plaintiff, including the defendants' acknowledgment that they (I) knew the decoders they sold would descramble TWEAN's scrambled programming services, (ii) sold devices to customers who stated their intention to use such devices on TWEAN's system[11] and advised such customers about circumventing TWEAN's and other cable operators' anti-piracy bullets, (iii) sold devices with "bullet busting" capabilities; and (iv) had a policy of replacing devices which were unable to fully descramble a cable company's signals, the conclusion that defendants' pirate decoder sales were intended by both defendants and their customers to be used for unauthorized interception of cable services is inescapable, Accordingly, there are no genuine issues of material fact with respect to the defendants' liability to TWEAN under 47 U.S.C. § 553, and summary judgment in favor of the plaintiff will be granted.

## IV. RELIEF TO BE GRANTED TO PLAINTIFF

### A. Recovery of Actual Damages and All of Defendants' Profits from their Pirate Decoder Sales Business

TWEAN asks the Court to award it the actual damages its suffered as a result of the defendants' cable piracy business, together with all of the defendants' profits, pursuant to 47 U.S.C. § 553(c)(3)(A)(i), which provides:

> the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the

---

**11.** TWEAN clearly is an "aggrieved person" within the meaning of Section 553(c)(1). It is a cable operator whose communications are being intercepted and is suffering the loss of cable customers, income and theft of services. *Freedom Electronics*, 897 F.Supp. at 1459; *Storer Communications*, 625 F.Supp. at 1199; *TKR Cable Co.*, 1996 WL 465508 at \*10–\*11.

TWEAN's subscribers were among those targeted by the defendants, who advertised in publications with nationwide circulation, local publications, including some in upstate New York in the vicinity of TWEAN's Albany, New York franchise area which has spearheaded this action, and on the Internet.

violation which are not taken into account in computing the actual damages; in determining the violator's profits, the party aggrieved shall be required to prove only the violator's gross revenue, and the violator shall be required to prove his deductible expenses and the elements of profit not attributable to factors other than the violation.[12]

The legislative history of Section 553, the import of which was not disputed by the defendants, confirms that the actual damages and profits provision was meant to provide an incentive to an aggrieved cable operator who commenced a civil action against a person or entity involved in cable piracy:

Under subparagraph (3)(A) the court is granted authority to award damages based on either of two methods of computation. The aggrieved party, pursuant to (3)(A)(i), may recover actual damages and *all profits of the violator attributable to the violation, including those profits attributable to the violation where it also occurred outside of the local area of the individual cable system,* that are not taken into account in calculating actual damages. In determining the violator's profits, the party aggrieved shall have the burden of establishing the violator's gross revenues by the best means available, while the violator shall have the burden of any expenses he incurred which are normally deductible in determining

profit, as well as any profit or revenues which are attributable to factors other than the violation.

H.R. No. 98–934, 98th Cong.2d Sess. 85 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin. News 4655, 4722 (emphasis added). In an unreported decision in *Time Warner Cable of New York City v. Cable Box Wholesalers,* No. 95–703–TUC–JMR (D.Ariz. Dec.7, 1995), the Court stated the following:

[P]laintiff may recover defendants' profits attributable to violations of § 553, including violations not involving plaintiff's areas of cable service. 47 U.S.C. § 553(c)(3)(A)(i); H.R.Rep. No. 934, 98th Cong., 2d Sess. 85 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4722.

Clearly, Congress intended that a cable pirate's profits were to serve as an incentive to an aggrieved cable operator who acted in the interests of all cable operators by civil prosecution of such decoder seller.

▬ In its motion, TWEAN indicated that it presently seeks only (I) this Court's determination of defendants' liability under 47 U.S.C. § 553 for their pirate decoder sales, and (ii) the Court's award to it of its actual damages and defendant' profits pursuant to Section 553(c)(3)(A)(i), in an amount to be determined subsequently. This Court determines that TWEAN shall be entitled to recover from the defendants, jointly and severally,[13] the actual damages reasonably incurred as a result of the 39

---

12. *See also* analogous § 605(e)(3)(C)(I)(I).

13. TWEAN pleaded, and this Court finds, that the respondent defendants were engaged in a scheme to manufacture, modify and sell pirate decoders). Second Amended Complaint ¶ 19, which is sufficient to impose joint and several liability on each of them. In *Sackman v. Liggett Group, Inc.,* 965 F.Supp. 391, 394 (E.D.N.Y.1997), the Eastern District of New York noted that civil conspiracy is not an independent tort or basis for liability, but merely provides for the extension of liability to one that participates in tortious conduct, supervises it, or profits from it, and stated, "A

claim for civil conspiracy is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts. Accordingly, allegations of conspiracy are only appropriate for the purpose of establishing joint liability by co-participants in a particular tortious conduct." *Id.* at 395 (citations omitted). The extension of liability to all culpable persons under a civil conspiracy theory is well-established. *See e.g. Kashi v. Gratsos,* 790 F.2d 1050, 1054–55 (2d Cir. 1986); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.,* 871 F.Supp. 709, 731 (S.D.N.Y.1995) (civil conspiracy alle-

identified sales into its Albany, New York system and all of defendants' profits from their pirate decoder sales business which TWEAN can prove.

## B. Enhanced Damages

In addition to its request for actual damages and all of defendants' profits in an amount to be subsequently determined, TWEAN presently requests an award of $50,000 in enhanced damages under Section 553. Section 553(c)(3)(B), which states that "the court in its discretion *may increase the award of damages,* whether actual or statutory under subparagraph (A), *by an amount of* not more than $50,-000,." clearly contemplates that such enhanced damages be awarded regardless of whether an aggrieved cable operator seeks statutory or actual damages. This enhanced damages award can be assessed in the Court's discretion against a defendant, such as the defendants herein, who committed violations of Section 553 willfully and for purposes of commercial advantage or private financial gain. *Freedom Electronics,* 897 F.Supp. at 1460; *Poll,* 124 F.3d at 1049. As the Supreme Court noted in *Trans World Airlines v. Thurston,* 469 U.S. 111, 127, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), the standard for willfulness in a civil case is lower, requiring proof only of "a disregard for the governing statute and an indifference to its requirements." The standard of willfulness set forth in *Thurston* has been adopted in this Circuit in actions under the Communications Act. *See Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829, 851 (11th Cir.1990).

In this case, the evidence, including the defendants' deposition testimony, demonstrates that they conducted their pirate decoder sales business willfully and with full knowledge of the damages caused to cable operators such as TWEAN as a result thereof. As a result of the action previously brought against them by Staten Island Cable, the defendants herein were fully aware of the existence of the specific federal statutes which forbade their conduct, and they were well acquainted with the precise nature of the harm, including monetary damages, which their pirate decoders caused . to cable systems such as those operated by TWEAN. Indeed, they intended that such harm, in the form of lost revenues, take place and their business depended upon their customers being able to access TWEAN's premium and Pay Per View services without payment to it.

In *General Instrument Corp. v. Nu–Tek Electronics & Mfg., Inc.,* No. 93–3854, 1997 WL 325804 (E.D.Pa. June 4, 1997)

gations "merely serve the proper purpose of allowing the acts of each of the defendants to be attributed to the others").

Similarly, the defendants can be held jointly and severally liable under an aiding and abetting liability theory. *See Electronic Laboratory Supply Co., Inc. v. Cullen,* 977 F.2d 798 (3d Cir.1992) (aiding and abetting liability should attach in civil actions if (as in the present case), they are based on federal criminal statutes); *K & S Partnership v. Continental Bank, N.A.,* 952 F.2d 971, 980 (8th Cir.1991) (analogizing civil conspiracy, which is not a separate cause of action but extends the scope of liability once an underlying tort claim has been established, to aiding and abetting liability). *See also Hafner v. Brown,* 983 F.2d 570, 576, fn. 6 (4th Cir.1992).

Finally, the evidence clearly demonstrates that defendant Marks personally participated

in Nationwide's and Worldwide's illegal business. *See, e.g.,* Allen Aff. ¶ 7 (investigator spoke to "Allan," who sold decoders to him on two separate occasions); Mahoney Aff.Ex. F. ("Al" responds to "Tim's" Internet inquiry by providing "legal opinion" that the sale and use of pirate decoders is legal). Accordingly, Marks may be held individually liable without recourse to piercing the corporate veil. *See, e.g., New Jersey Dept. of Environmental Protection v. Gloucester Environmental Mgt. Servs., Inc.,* 800 F.Supp. 1210, 1219 n. 9 (D.N.J. 1992) ("Generally corporate shareholders or officers may be held personally liable for the corporation's violations of the law where the officer has participated in the wrongful acts of the corporation . . .").

.(Gawthrop, J.), the Court awarded the full measure of discretionary damages under similar circumstances and stated the following:

> As for the punitive damages here, anything less than $50,000 would be uncalled for. The defendant, speaking through its president and CEO, Mr. David J. Abboud, made huge sums of money, well knowing that it was—and he was—repeatedly and brazenly flouting the law in so doing. Mr. Abboud's testimony at trial, in which he sanctimoniously sought to profess ignorance of that reality, was an exercise in rank perjury. At $50,000, he gets off cheap.

*Id.* at * 3.

In assessing the full measure of enhanced damages against the defendants herein under Section 553(c)(3)(B), the Court has considered the legislative intent embodied by this provision that commercial enterprises conducted, as here, for private financial gain should be assessed substantial liability, if not punitive-type damages. Based on the concerted effort of the defendants directed against the plaintiff and other cable operators, the maximum assessment of $50,000.00 in enhanced damages against each of the defendants, jointly and severally, is appropriate.

### C. Award of Plaintiff's Attorneys' Fees and Investigative Costs

Under Section 553(c)(2)(C), a court may award recovery of full costs, including reasonable attorneys' fees, to a prevailing aggrieved party. *See Poll,* 124 F.3d at 1046 (noting district court's award of attorneys' fees); *Sykes I,* 997 F.2d at 1009; *Nu–Tek,*

1997 WL 325804 at *3; *American Cablevision of Queens v. McGinn,* 817 F.Supp. 317, 320 (E.D.N.Y.1993). *See also Time Warner Cable of New York City v. U.S. Cable T.V., Inc.,* 920 F.Supp. 321, 329 (E.D.N.Y.1996); *Muneyyirci,* 876 F.Supp. at 422. Full costs may include, recovery of investigative costs. *See, e.g., In re Cohen,* 121 B.R. 267, 269 (Bankr.E.D.N.Y.1990) (noting district court award of investigative fees pursuant to Section 553 as part of overall damage assessment against similar pirate decoder distributor). In light of the clear need to put an end to the defendants' illegal conduct, the Court awards the plaintiff recovery of its reasonable attorneys' fees and investigative costs in an amount to be determined after submission of documentation of fees and expenses.

### D. Permanent Injunctive Relief

█ Section 553 authorizes a court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations . . . ." Section 553(c)(2)(A). When express authority for issuance of "statutory" injunctions is provided by legislative enactment, an injunction may issue without resort to the traditional "equitable" prerequisites of such relief. *See TKR Cable Co.,* 1996 WL 465508 at *10; *Freedom Electronics,* 897 F.Supp. at 1460 (citing *Burlington N.R.R. Co. v. Dep't of Revenue,* 934 F.2d 1064, 1074–75 (9th Cir.1991)); *Duke v. Uniroyal, Inc.,* 777 F.Supp. 428, 432–33 (E.D.N.C. 1991) (court found that it could issue an injunction without evaluating traditional factors); *Securities Industry Ass'n v. Board of Governors of Federal Reserve System,* 628 F.Supp. 1438 (D.D.C.1986).[14]

█ In this case, the entry of a permanent injunction pursuant to Section 553 is

---

14. Apart from the proven violations of Section 553 committed by defendants, the injunction sought is clearly in the public interest, as defendants' conduct is unquestionably criminal in nature, and the public's interest in preventing such conduct is evident. *See Securities Indus. Ass'n,* 628 F.Supp. at 1443 (in cases where injunctive relief is sought to prevent continuing violations of federal statutes, "the equities to be balanced are not simply those of the private litigants, but also the interests of the public as defined by Congress"). *See also Cox Cable Cleveland Area v. King,* 582 F.Supp. 376, 381 (N.D.Ohio 1983) ("Congress and the Courts have recognized

more than justified. The defendants' entire business was based upon undermining the industry's integrity while providing tools for dishonest persons to steal cable operators' products. Moreover, there is a clear risk that defendants will continue such criminal conduct in the future. The defendants' recidivist conduct and denial of any wrongdoing in the face of overwhelming proof amply demonstrates that they are likely to commence such an illegal operation again. Accordingly, the defendants will be enjoined from entering this illegal market in any capacity in the future. *See e.g., Columbia Cable TV*, 954 F.Supp. at 128 (permanent injunction issued under § 553); *Poll*, 124 F.3d at 1046 (referencing district court's entry of permanent injunction under § 553). Any lesser measure would require each of the thousands of cable operators in the United States to commence separate actions against the defendants in order to protect their respective interests, a wholly unnecessary result given the manifestly illegal nature of their business and the injunctive power provided for by Section 553.

## V. CONCLUSION

The Court has considered the parties' submissions with respect to the Motion and the pertinent portions of the record and being otherwise fully advised in the premises, it is

**ORDERED AND ADJUDGED** that the plaintiff's motion for summary judgment [DE 57] be, and the same hereby is **GRANTED,** and the Court

(i) finds that the defendants are liable to plaintiff for the 39 violations of 47 U.S.C. § 553 identified in the motion;

(ii) finds additionally that the defendants' violations were committed willfully and for purposes of the defendants' commercial advantage or private financial gain;

(iii) awards to the plaintiff pursuant to 47 U.S.C. § 553(c)(2)(C) the actual damages reasonably shown to result to it from the defendants' 39 violations of Section 553, and all of defendants' profits from their pirate decoder sales operation, with the amount of such damages and profits award to be determined after plaintiff's submissions in support of the specific amounts requested, and with judgment for such amount to be a final judgment pursuant to Fed.R.Civ.P. 54(b);

(iv) awards to plaintiff $50,000 in enhanced damages pursuant to 47 U.S.C. § 553(c)(3)(B), with judgment for such amount to be a final judgment pursuant to Fed.R.Civ.P. 54(b);

(v) pursuant to 47 U.S.C. § 553(c)(2)(A), modifies the preliminary injunction and merges it into this Order, and enjoins the defendants from further possession, use, manufacture, modification, sale or distribution of pirate cable television decoding devices, as that term is defined in the preliminary injunction; and

(vi) pursuant to 47 U.S.C. § 553(c)(2)(C), awards to TWEAN its costs, including reasonable attorneys' fees

and protected Cox's interest in cable television communications").

Numerous other courts have also noted that the entry of an injunction against defendants' continued sale and distribution of unauthorized cable television decoding devices does not harm and, in fact, will promote the public interest. *TKR Cable Co.*, 1996 WL 465508 at * 11 (noting that cable piracy undermines intellectual property rights of creators and owners of stolen programming); *Freedom Electronics*, 897 F.Supp. at 1460 (noting that

cable piracy may result in FCC-prohibited "signal leakage" and creates an unfair subsidy to "freeloaders"). *See also Storer Communications*, 625 F.Supp. at 1203 (noting loss of franchise fees to municipalities from cable piracy); *Kaufmann*, 606 F.Supp. at 1546; *Cox Cable*, 582 F.Supp. at 381 (noting that lost cash flow to cable operators adversely affects their ability to purchase and maintain a higher quality of programming services for their subscribers).

and investigative costs, incurred in asserting its claims against the defendants, with the amount of such award to be determined after the plaintiff's submissions in support of the specific amounts requested, and with judgment for such amount to be a final judgment pursuant to Fed.R.Civ.P. 54(b).

**DONE AND ORDERED.**